132 P.3d 80 (2006)
156 Wash.2d 580
STATE of Washington, Respondent,
v.
Dayva CROSS, Appellant.
No. 71267-1.
Supreme Court of Washington, En Banc.
Argued June 22, 2004.
Decided March 30, 2006.
*85 Todd Maybrown, Allen Hansen & Maybrown PS, Kathryn Lund Ross WA State Death Penalty Assistance Center Seattle, WA, for Appellant.
Deborah A. Dwyer, King County Prosecutor Office/Appellate Unit, Norman Kim Maleng, Donald James Raz, Attorneys at Law, James Morrissey Whisman, Lee Davis Yates, King County Prosecutor's Office, Seattle, WA, for Respondent.
Beth Marie Andrus, Attorney at Law, Seattle, WA, for Amicus Curiae on behalf of American Civil Liberties Union of Washington.
CHAMBERS, J.
ś 1 Dayva Cross killed three people, his wife and two of her three daughters. The King County Prosecuting Attorney's Office sought the death penalty. After Cross pleaded guilty to three counts of aggravated first degree murder and one count of kidnapping, a sentencing jury sentenced him to death. We must determine whether he has shown reversible error. Finding he has not, we affirm.

FACTS
ś 2 One March 1999 evening, Cross struck his wife, Anoutchka, in the face during an argument. The next morning, Anoutchka's 13-year-old daughter, M.B., woke to the sounds of Cross brutally and repeatedly stabbing her mother and her elder sister, 18-year-old Solome, to death. Clerk's Papers (CP) at 1217-20; Report of Proceedings (RP) (Apr. 17, 2000) at 110. Cross then tried to force his way into the bedroom M.B. shared with her 15-year-old sister, Amanda. Despite Amanda's efforts to keep the door closed, Cross forced it off its hinges and killed her in front of M.B.'s eyes. RP (Apr. 18, 2001) at 20-22. Cross then kept M.B. confined at knife point for five hours while he drank wine and watched television. Id. at 60; CP at 1220. M.B. escaped after he fell asleep. RP (Apr. 18, 2001) at 37.
ś 3 Cross was arrested without incident that afternoon. RP (Apr. 16, 2001) at 93-96. After he was arrested, officers and medics reentered the home, confirmed that the victims had been killed, and took pictures of the crime scene. CP at 1098. Officers conducted a more sweeping search after they obtained a search warrant. RP (Apr. 12, 2001) at 31.
ś 4 Cross has a long history of mental illness. RP (Apr. 11, 2001) at 52-53, 55; RP (May 1, 2001) at 47. Before March 1999, he had one prior criminal conviction for misdemeanor reckless endangerment. RP (Apr. 11, 2001) at 52. He has attempted suicide at least two times since the 1999 killings. In attempting to take his own life, Cross has fractured his skull and cervical column, has injured his brain and spine, and has rendered himself paraplegic. Id. at 51, 60-61; RP (Apr. 23, 2001) at 74-92. One jury panel had to be dismissed after widespread media coverage of one of his suicide attempts.
ś 5 Initially, Cross pleaded not guilty by reason of insanity and informed the court he also intended to present a diminished capacity defense. CP at 281-82. Some time later, and against his counsels' advice, he withdrew his not guilty plea and entered an Alford plea. RP (Sept. 25, 2000) at 49-52; See N. Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); State v. Newton, 87 Wash.2d 363, 552 P.2d 682 (1976). The trial judge accepted Cross's plea only after a probing inquiry, which included a competency evaluation at Western State Hospital and review of extensive argument and evidence. CP at 1212-1647; 2156-62; RP (Oct. 15, 2000) at 11-39; RP (Oct. 19, 2000) at 2-34; RP (Oct. 23, 2000) at 9-198. In his Alford plea, Cross specifically denied premeditating the murders. CP at 1651-87. At that time, the prosecution effectively agreed that he could argue lack of premeditation to the sentencing jury as a mitigating factor. His counsel began preparing a mitigation defense based in part on Cross's mental health history.
ś 6 Cross made frequent furious outbursts in court, often swearing at the judge and prosecution. E.g., CP at 2273. While Cross vacillated somewhat, he became increasingly set against presenting expert testimony on his mental health. CP at 2151. Because counsel was adamant this testimony was required, *86 Cross made multiple motions to fire his attorneys, proceed pro se, or have different counsel appointed. E.g., RP (Apr. 18, 2001) at 6; CP at 2148. It is clear from the record that his counsel believed Cross's best chance to avoid a death sentence was his poor mental health. E.g., RP (Feb. 12, 2001) at 2-10; CP at 2185-87. This conflict created increasing tension.
ś 7 After two unsuccessful tries, a sentencing jury was impaneled. This jury considered testimony from experts, from Cross's family, and from friends and family of his victims. RP (May 1, 2001) at 3-159; RP (June 22, 2001) at 13; RP (May 14, 2001) at 4. The jury unanimously found beyond a reasonable doubt that mercy was not warranted, and Cross was sentenced to death. RP (June 22, 2001) at 16. This appeal followed.

ANALYSIS
ś 8 Cross pleaded guilty to the underlying crime. Most of the issues before the court are limited to the sentencing phase and will be given heightened scrutiny. State v. Benn, 120 Wash.2d 631, 648, 845 P.2d 289 (1993). We construe procedural rules liberally in capital cases even when errors are raised for the first time on appeal. State v. Lord, 117 Wash.2d 829, 849, 822 P.2d 177 (1991).

1. JURY SELECTION
ś 9 Cross challenges the exclusion of several jurors who expressed concerns about the death penalty. We find no error.
ś 10 The Sixth Amendment guarantees the right to a fair and impartial jury. State v. Brett, 126 Wash.2d 136, 157, 892 P.2d 29 (1995). To protect both the defendant's right to a fair sentencing hearing, and the State's ability to adequately present its arguments, trial courts first "death qualify" the jury by ascertaining whether the individual jurors will be able to impartially judge both the case and the penalty. See Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). We do not exclude a juror who has scruples about capital punishment unless the views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright, 469 U.S. at 424, 105 S.Ct. 844(quoting Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); cf. RCW 4.44.170(2) (allowing challenges for cause "[f]or the existence of a state of mind on the part of the juror . . . which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging"). Opposition to the death penalty is no bar to serving on a capital sentencing jury so long as the prospective jurors can "temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
ś 11 Trial courts bear the heavy responsibility of ensuring that a jury is "death qualified." State v. Brown, 132 Wash.2d 529, 593, 940 P.2d 546 (1997). The trial judge's factual conclusion is reviewed for manifest abuse of discretion. Brown, 132 Wash.2d at 601-02, 940 P.2d 546; see also Wainwright, 469 U.S. at 428, 105 S.Ct. 844 (review is deferential). Whether a juror can actually set aside personal opposition to the death penalty is ultimately a factual decision, and we give considerable deference to the trial judge's determination, especially since the trial judge is in the best position to assess juror body language, tone, and verbal responses. Cf. Brown, 132 Wash.2d at 603-04, 940 P.2d 546(finding no abuse of discretion when trial court excluded a juror with strong objections to the death penalty who nonetheless said she could follow the instructions, specifically noting that her body language clearly indicated otherwise); State v. Rupe, 108 Wash.2d 734, 749, 743 P.2d 210 (1987) (Rupe II). However, the erroneous exclusion of a single juror who has scruples about the death penalty, but is nonetheless qualified to serve, results in automatic reversal. Gray v. Mississippi, 481 U.S. 648, 659, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
ś 12 We consider each juror challenged separately.

*87 A. JUROR 8

ś 13 Juror 8 initially told the court that "I would support the death penalty depending on the case and the circumstances." RP (Feb. 28, 2001) at 41. After further reflection, he informed the court he would have difficulty considering the case objectively because Cross was confined to a wheelchair:
[W]e have to decide whether or not the defendant should die for the crimes, no matter how heinous they may be. And given the condition that he's in, I'm not sure that I could make that decision. It just seems to me to be a little bit wrong, or I don't feel comfortable making that decision.
RP (Apr. 5, 2001) at 80. Later, he said, "I would have a hard time [sentencing a paraplegic to death]. I'm not sure I could be totally unbiased." Id. at 81. After a brief argument between prosecution and defense, the trial judge excused the juror for cause concluding that:
[W]hat he is telling us today is that [his prior willingness to consider the death penalty] is no longer accurate, having considered it, thought about it, given his current physical condition, there is no way that he believes he could make a decision fairly.
And it is not that he couldn't make a decision, but he cannot make a decision fairly.
Id. at 83.
ś 14 This challenge raises a difficult question because Cross's disability is a potential mitigating factor. See Skipper v. S. Carolina, 476 U.S. 1, 4-5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding the constitution requires "that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record" (emphasis and footnote omitted)). Cross was entitled to ask the jury to grant him mercy on the grounds of his physical state. However, the trial judge clearly concluded that Juror 8's mind was closed. Potential jurors must "be willing to consider all of the penalties provided by state law, and . . . not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." Witherspoon v. Illinois, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
ś 15 The trial judge clearly concluded that Juror 8 was not meaningfully willing or able to consider the death penalty given the specific evidence in the case. It was not an abuse of discretion to exclude this juror.

B. JUROR 32
ś 16 Juror 32 expressed reservations about the death penalty from the beginning, but was not adamantly opposed to it. E.g., RP (Apr. 4, 2001) at 47 ("sometimes it is necessary."). She said she could conceive of herself on a jury that rendered a death verdict. Id. at 42. She also said she would have to be certain and beyond "all doubt" that a death sentence was justified before she could impose it. Id. at 47-40, 57. Given this, it does not appear that her scruples would disqualify her.
ś 17 After a review of the record, we conclude she was properly excluded for a different reason. As the trial judge explained:
She is not tracking. You guys could lead her down any path you wanted to, depending on who was talking to her, and she does not understand what the law is. And I think, frankly, her age plays into this. I think her ability to concentrate, and attend, since she couldn't carry through on certain basic concepts from his questioning to yours. We'll let her go.
Id. at 58-59. After voir dire, the trial judge concluded that this juror was not able to fully and fairly consider the evidence in this case. Cross has not shown manifest abuse of discretion in the exclusion of this juror.

C. JUROR 204[1]
ś 18 Juror 204 had clear reservations about the death penalty. She said:

*88 Generally speaking, I don't really like [the death penalty]. I didn't vote for it. . . . That brings up the question, is it a just law? Becauseâ 
Just because I don't like something doesn't mean I wouldn't abide by it. And quite honestly, through these months of thinking . . . I can't necessarily say it is an unjust law, but I can say I don't really like it.
RP (Mar. 21, 2001) at 97. She later expanded that "[i]f there is any way I could give the person life rather than the other, I would prefer to do that." Id. at 113. She affirmed, though, that she could follow the law and the instructions. Id. at 155-56("I'm here to serve the court, and so the court will have to guide me, and you guys know a whole lot more about this matter than I do."); Id. at 122("I would certainly not just stand by what I believed to be right, but I would be open minded and I would be willing to listen to the other side, but I will be true to myself."). When asked if she could envision herself on a panel that sentenced someone to death, she said she could. Id. at 121.
ś 19 While Juror 204 answered many questions cogently and incisively, she also had difficulty tracking other questions. E.g., RP (Mar. 21, 2001) at 129. She frequently seemed to change her mind, question to question. E.g., Id. at 101-02. The trial court concluded:
We spent 50 minutes on that juror. . . .
I thought we were at a badminton match, because she constantly went back and forth and back and forth, and . . . if I were either one of you, I wouldn't want her on this case because there was no certainty she could follow the court's instructions.
Id. at 131-32. The trial judge excluded this juror on the grounds she could not follow the court's instructions. This was not an abuse of discretion.

D. JUROR 30
ś 20 Juror 30 had significant concerns about the death penalty, though he did say there might be a situation where he would find it justified.[2]E.g., RP (Apr. 4, 2001) at 31-32. But even from the cold record, the trial court had good reason to find that Juror 30 was not death qualified. He was willing to accept that his society had the death penalty, but gave every indication he would never seriously consider it. Cross has not established that the trial judge abused her discretion in excluding this juror.

E. JUROR 206
ś 21 Juror 206 was not opposed to the death penalty in principle. But "it is not something to be taken lightly or used frivolously." RP (Mar. 21, 2001) at 168. He questioned its effectiveness as a deterrent and its expense. Id. He did put significant limitations on the cases where he would find the death penalty appropriate, though he specifically (and repeatedly) cited Hitler as an example of someone who should be put to death. Id. at 168, 174. He informed the court that before he would impose the death penalty, the State would have to show more than the law requires. E.g., Id. at 178. The trial judge concluded Juror 206 could not follow the law, despite his assertions to the contrary. Again, the trial judge observed the juror and made that judgment. Cross has not shown manifest abuse of discretion. Accord Brown, 132 Wash.2d at 602-03, 940 P.2d 546(affirming exclusion of juror who said, "I don't think I could. It would have to be so crystal clear. It would just have to beâ [.]").
*89 ś 22 We find no manifest abuse of discretion in excluding any of the challenged jurors.

2. PREMEDITATION INSTRUCTION
ś 23 Cross argues that he was effectively denied the benefit of his Alford plea because the jury was not specifically instructed that it could consider whether he actually premeditated these killings, but instead might have concluded from the fact he pleaded guilty to the crime that premeditation was a settled issue. We note that he does not seek to withdraw his guilty plea, but instead argues that the trial court's failure to give this instruction fatally taints the procedure. Cross did not request an instruction which would have put the issue squarely before the jury. This would normally weigh against review. Nonetheless, since this is a capital sentencing case, we will consider the substance of this claim. Benn, 120 Wash.2d at 660, 845 P.2d 289; Lord, 117 Wash.2d at 849, 822 P.2d 177.[3]
ś 24 Cross had good reason to believe he could argue lack of premeditation to the sentencing jury. The State specifically argued in support of Cross's Alford plea, that the plea was to Cross's advantage in part because it "would enable him to continue to argue [a lack of premeditation and planning] in the mitigation or sentencing phase of [] trial." RP (Oct. 16, 2000) at 26-27. Additionally, the State contended that the benefit of being able to argue "that he should not be put to death because he did not plan these murders" was "substantial." CP at 1199. Cross now claims he was denied the benefits promised by the State as part of the plea process.
ś 25 But Cross does not challenge the definition of premeditation given to the jury, and we note that Cross did argue extensively that he lacked premeditation.[4] We turn now to the specific challenges he does make.

A. FOURTEENTH AMENDMENT
ś 26 Cross claims the lack of the premeditation instruction violated his Fourteenth Amendment rights by functionally entrapping him into entering a plea by an inducement that was never satisfied. Without, again, prejudging whether this argument has merit in the context of a motion to withdraw a plea or an ineffective assistance of counsel claim, we find no generalized constitutional error.
ś 27 The State, under certain circumstances, may not assure a person that a right exists and then act contrary to that assurance without violating due process of law. See Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). In Raley, the Un-American Activities Commission of the Ohio Legislature summoned witnesses and assured them they could decline to answer questions that would tend to incriminate them. However, an Ohio statute immunized witness testimony, meaning self-incrimination was not possible as a matter of law. The witnesses declined to answer some questions and were subsequently convicted of contempt of the state legislature. Id. at 425, 79 S.Ct. 1257. The United States Supreme Court reversed their convictions, concluding to do otherwise "would be to sanction an indefensible sort of entrapment by the State-convicting a citizen for exercising a privilege which the State had clearly told him was available to him." Id. at 426, 79 S.Ct. 1257. Cross argues he suffered a similar entrapment here. But this takes Raley far from its holding. The State did not prevent Cross from arguing he lacked premeditation. The *90 State did not oppose a jury instruction that would have allowed Cross to put this matter clearly before the jury.[5] Any prejudice to Cross was not caused by the State's actions, a necessary predicate for a Raley error.

B. EIGHTH AMENDMENT CLAIM
ś 28 Reduced to its essence, Cross argues that without a specific instruction allowing the jury to decide whether premeditation actually existed, the jury was unable to fully consider the mitigating evidence relating to premeditation. Cross relies upon the United States Supreme Court's holdings in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Penry I) and Penry v. Johnson, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (Penry II).
ś 29 In Penry I, the defendant challenged his capital sentence on the grounds the special jury instructions did not authorize the jury to consider the actual mitigating evidence presented (that he was abused as a child and suffered from mental retardation). Instead, the jury was limited to considering (1) whether the defendant acted deliberately, (2) whether the defendant was probably dangerous, and (3) whether the defendant acted out of proportion to the decedent's provocation. Penry I, 492 U.S. at 310, 109 S.Ct. 2934.
ś 30 Penry argued that he was denied his Eighth Amendment right to "an individualized assessment of the appropriateness of the death penalty," during which "the sentencer must be allowed to consider mitigating evidence." Id. at 316-17, 109 S.Ct. 2934. The Supreme Court agreed. It concluded "that the jury was not provided with a vehicle for expressing its `reasoned moral response' to [the mitigating] evidence in rendering its sentencing decision." Id. at 328, 109 S.Ct. 2934. The court reversed and remanded for resentencing. Id. at 328, 109 S.Ct. 2934.
ś 31 On remand, the jury was again instructed to answer the same three special verdict questions that had been found constitutionally inadequate, but it was also given the following supplemental instruction:
"You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances.. . . A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. . . . If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues."
Penry II, 532 U.S. at 789-90, 121 S.Ct. 1910 (emphasis added). The trial judge instructed the jury to lie on the special verdict form if it found sufficient grounds for mercy. For whatever reason, the jury answered "yes" to each of the special issues, and Penry was again sentenced to death.
ś 32 Again Penry challenged the constitutional adequacy of the jury instructions. And again, the Supreme Court reversed his sentence because the jury was not provided a "`vehicle for expressing its `reasoned moral response' to that evidence in rendering its sentencing decision.'" Penry II, 532 U.S. at 797, 121 S.Ct. 1910 (quoting Penry I, 492 U.S. at 328, 109 S.Ct. 2934). The court specifically found the nullification instruction constitutionally inadequate because "it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation." Penry II, 532 U.S. at 799, 121 S.Ct. 1910. It also explained that:

Penry I did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under Penry I is that the jury *91 be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence."
Penry II, 532 U.S. at 797, 121 S.Ct. 1910 (quoting Penry I, 492 U.S. at 319, 109 S.Ct. 2934) (alteration in original). The question is, then, whether we must reverse under the Penry standards, which require a meaningful avenue for the jury to consider mitigating evidence.
ś 33 The State correctly notes that Cross could, and did, argue to the jury that he lacked premeditation and that he asked the jury to consider his state of mind. RP (Apr. 11, 2001) at 45. However, it does not necessarily follow that the jury was given an adequate vehicle for considering his mitigating evidence. In both Penry I and Penry II, the defendant was allowed to introduce evidence of his mental retardation and history of being abused. Yet, because of the limiting scope of the Texas special verdict questions, the juries could consider the mitigating evidence but not give effect to it, unless they were willing to falsify the verdict form.
ś 34 Unlike the special verdict questions in the Penry cases, the instructions given to Cross's sentencing jury did not expressly or even impliedly limit the scope of the jury's inquiry. Instead, capital sentencing juries in Washington are instructed broadly that a mitigating circumstance is any fact "which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence less than death." CP at 1989 (Jury Instruction 8); see also 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 31.07, at 357 (2d ed.1994) (same); RCW 10.95.060(4) (requiring juries to find "beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency" before returning a death penalty verdict). Nor was the jury here instructed to ignore the law if it found mercy warranted.[6] Instead, it was explicitly instructed to consider all mitigating factors.
ś 35 Under the instructions given, the jury had a vehicle for expressing its reasoned moral response. Given this, we cannot say that the absence of an unrequested instruction violated Cross's Eighth Amendment rights.

3. REPRESENTATION
ś 36 Cross argues that he was effectively denied his right to counsel, largely on the grounds that he and his counsel disagreed about whether, and to what extent, his mental health should be an issue at sentencing. E.g., RP (Sept. 7, 2000) at 1-6. We review this question de novo, though we accord appropriate deference to the trial court's determination of the underlying facts. Cf. State v. Ramos, 83 Wash.App. 622, 628-29, 922 P.2d 193 (1996) (quoting RPC 1.9(a)). We hold that this conflict did not amount to a violation of Cross's right to counsel.
ś 37 Prior to trial, Cross became increasingly opposed to the use of expert testimony regarding his mental health. E.g., CP at 2151. Even before Cross decided to plead guilty, he and his attorneys clashed over this strategy question. E.g., RP (Sept. 18, 2000) at 119. The trial judge was well aware of the conflict, and she considered whether to appoint new counsel several times. See, e.g., RP (Jan. 26, 2001) at 159-60, 184-87, 188; RP (Feb. 1, 2001) at 662; CP at 1899-94; CP at 2163(reviewing additional history of Cross's motions). After extensive briefing and argument, the trial judge ruled that whether mental health expert testimony would be used was a question of strategy for counsel. RP (Feb. 12, 2001) at 6-7.
ś 38 Cross objected to the decision to present evidence of his poor mental health to the jury then, and he objects now. However, as Judge Joan E. DuBuque properly ruled, this is a strategy decision in the hands of defense *92 counsel, not the client. State v. Piche, 71 Wash.2d 583, 590, 430 P.2d 522 (1967) ("[T]he choice of trial tactics, the action to be taken or avoided, and the methodology to be employed must rest in the attorney's judgment."); see generally 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE sec. 11.6, Counsel's Control Over Defense Strategy (2d ed.2004) (collecting cases); accord United States v. Kaczynski, 239 F.3d 1108, 1118 (9th Cir.2001).
ś 39 While the details of strategy are generally for counsel to decide, not the client, defendants do have considerable control of their defenses. The Sixth Amendment ensures defendants' right to knowingly and voluntarily decline the assistance of counsel. See Faretta v. California, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This right has substantive implications for the attorney/client relationship. When the "relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates the defendant's Sixth Amendment right to effective assistance of counsel," even if no actual prejudice is shown. In re Pers. Restraint of Stenson, 142 Wash.2d 710, 722, 16 P.3d 1 (2001). However, there is a difference between a complete collapse and mere lack of accord. Cf. Morris v. Slappy, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (constitution does not require a "meaningful relationship" between attorney and client).
ś 40 A defendant may not discharge appointed counsel unless the motion is timely and upon proper grounds. Restraint of Stenson, 142 Wash.2d at 732-34, 16 P.3d 1. Generally, the client decides the goals of litigation and whether to exercise some specific constitutional rights, and the attorney determines the means. Cf. RPC 1.2(a)("A lawyer shall abide by a client's decisions concerning the objectives of representation. . . . [and] shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify."); see also Martin Sabelli & Stacey Leyton, Train Wrecks and Freeway Crashes: An Argument for Fairness and Against Self Representation in the Criminal Justice System, 91 J.CRIM. L. & CRIMINOLOGY 161, 166 (2000) (strongly advocating "presentation of all evidence of mental disability relevant to determining criminal intent even if the client opposes this presentation.").
ś 41 Cross frames this issue in three separate ways: that independent counsel should have been appointed to investigate the conflict, that there was an irreconcilable conflict between him and his attorneys, or that he should have been allowed to proceed pro se or with new counsel. When reviewing a trial court's refusal to appoint new counsel, we consider "(1) the extent of the conflict, (2) the adequacy of the [trial court's] inquiry, and (3) the timeliness of the motion." Restraint of Stenson, 142 Wash.2d at 724, 16 P.3d 1 (citing United States v. Moore, 159 F.3d 1154, 1158-59 (9th Cir.1998)). Requests to proceed pro se must be timely and stated unequivocally. State v. Stenson, 132 Wash.2d 668, 737, 940 P.2d 1239 (1997). Cross does not argue that a different test should be applied for the appointment of independent counsel or for conflict of interest, and we assume without deciding that the same analysis is appropriate. We generally review trial court decisions relating to attorney/client differences for abuse of discretion. See Stenson, 132 Wash.2d at 733, 940 P.2d 1239(citing State v. DeWeese, 117 Wash.2d 369, 375-76, 816 P.2d 1 (1991)).

A. EXTENT OF THE CONFLICT
ś 42 First, a conflict over strategy is not the same thing as a conflict of interest. Restraint of Stenson, 142 Wash.2d at 722, 16 P.3d 1. In Stenson, counsel made the strategic decision, after the jury had convicted his client of murder, to concede his client's guilt while arguing to that same jury that his client deserved mercy. Stenson, however, wished to continue to assert his innocence through the sentencing phase of his capital trial. We held that this was a strategy decision in the hands of counsel and no right of Stensen had been compromised. Id. at 732, 16 P.3d 1.
ś 43 Here, similarly, the conflict was only about trial strategy. Counsel clearly believed that given the overwhelming evidence *93 that Cross had killed his family, the best or only defense available was to plead (in the guilt phase) that Cross was not guilty by reason of insanity, or lacked the ability to premeditate, or suffered from diminished capacity. Counsel also clearly believed that the best or only chance to persuade the jury to show mercy was on the basis of Cross's poor mental health. Cross did not want to move forward on this strategy, but, as trial judge noted, Cross frequently changed his mind. CP at 2149. The trial court conducted an extensive in camera hearing during a break from voir dire to determine whether the very real dispute between Cross and his counsel justified intervention. RP (Jan. 31, 2001) at 537-59; cf. Restraint of Stenson, 142 Wash.2d at 730-37, 16 P.3d 1 (during similar hearing during voir dire, judge observed that aside from the conflict over strategy, defendant worked well with counsel).
ś 44 While not determinative, the relationship between attorney and client does bear on whether representation has been irrevocably poisoned. Cf. Restraint of Stenson, 142 Wash.2d at 728-29, 16 P.3d 1. Judge DuBuque, who had been involved in the case for 18 months and had ample opportunity to observe the relationship between counsel and Cross develop, noted that "every time you have been in court, I have observed a very good, positive attorney/client relationship." RP (Jan. 31, 2001) at 538-39; see also RP (Apr. 18, 2001) at 7-8 (judge noted for the record that "there has been . . . nothing but cordial calm conversation between counsel and their client."). Counsel concurred that their relationship with Cross was generally good. RP (Jan. 31, 2001) at 538; RP (Apr. 18, 2001) at 8. Cross acknowledged that he was able to communicate with his counsel, that "[t]hey are pretty easy going," and that he could work with them. RP (Jan. 31, 2001) at 540, 547. But he explained that he did not want the expert testimony on his mental health because:
I have never cared for the psychiatrists.. . . There is too much stuff pulled over them. I felt there was too much crap to believe the psychiatrists.
. . . .
I will live with this trial for the rest of my life. And I don't want a lie or communications like this that everyone wants to mount a defense, and it's a bunch of bull shit. From the beginning, all I wanted to do is plead guilty and get it over with.
. . . .
I think everybody suffers from depression at some time and that's no excuse for crime.
Id. at 540-41.[7]
ś 45 This is not the type of conflict with counsel that raises Sixth Amendment concerns. Cf. Mickens v. Taylor, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (actual conflict of interest could include attorney representation of a witness); Frazer v. United States, 18 F.3d 778, 785 (9th Cir.1994) (conflict existed when attorney verbally assaulted client with racially derogatory term); Brown v. Craven, 424 F.2d 1166, 1169-70 (9th Cir.1970) (perfunctory work can rise to cognizable conflict); accord Restraint of Stenson, 142 Wash.2d at 729, 16 P.3d 1 (fact that attorney and client disagreed over trial strategy not sufficient to find a cognizable conflict even after counsel testified that he "can't stand the sight of" his client). Instead, this is the type of conflict that courts generally leave to the attorney and client to work out, absent actual ineffective assistance of counsel. Cf. Kaczynski, 239 F.3d at 1118 (refusing to find plea involuntary even if it were motivated by defendant's desire not to have mental health evidence submitted to the jury).
ś 46 Cross has not demonstrated a legally cognizable conflict giving rise to error.

B. ADEQUACY OF THE TRIAL COURT'S INQUIRY
ś 47 An adequate inquiry must include a full airing of the concerns (which may be done in camera) and a meaningful inquiry by the trial court. Restraint of Stenson, 142 Wash.2d at 731, 16 P.3d 1. After careful review, we conclude Judge DuBuque's repeated inquiry was meaningful and full. RP (Jan. 31, 2001) at 537-59; RP (Feb. 12, 2001) *94 at 2-10; RP (Feb. 27, 2001) at 19-33; CP at 2185-87. In one of these proceedings, the judge noted:
Mr. Cross himself has never expressed in any fashion whatsoever any dissatisfaction or the desire to have independent legal counsel, and you have given to the Court very cogent and compelling reasons as to why I should not take that step, which is the relationship of the long-term duration, as I indicated, every time you have been in the courtroom . . . there has been high quality representation, extremely high quality advocacy, and a good relationship before. . . .
I do not want to jeopardize what I see as a good working relationship when there is no expressed desire or need for the Court to do so.
RP (Jan. 31, 2001) at 548. The trial court was fully apprised of the conflict and again specially requested (and received) briefing on whether Cross or his counsel had the power to decide the mitigation strategy. Id. at 549; CP at 1899-1904. The judge made a careful review of the dispute and ruled that the strategic conflict between counsel and Cross was not the sort of conflict that required intervention. Cross has not shown any inadequacy in the inquiry.[8]

C. REQUEST TO PROCEED PRO SE
ś 48 A request to proceed pro se must be timely and unequivocal. Stenson, 142 Wash.2d at 737, 16 P.3d 1. Cross's formal motion to proceed pro se was made on April 24, 2001, four months into the trial, three days after the State had rested its case and after the defense had itself presented several witnesses. CP at 2149-50. Cross refused to assure the judge that he would refrain from outbursts in court. CP at 2152. The court found that granting the motion would cause a considerable delay and that delay was Cross's purpose. CP at 2153(citing State v. Fritz, 21 Wash.App. 354, 585 P.2d 173 (1978)). Either finding was an adequate basis for denying a motion to proceed pro se. Fritz, 21 Wash.App. at 363-65, 585 P.2d 173. Cross has not shown the trial court abused her discretion.
ś 49 Again, strategy decisions are for the attorney. In this case, the very real conflict between counsel and client was about strategy. Until and unless the disagreement about strategy actually compromises the attorney's ability to provide adequate representation, strategy differences do not violate any constitutional rights held by defendants. We affirm.

4. GUILTY PLEA
ś 50 Cross's counsel argues that Cross should not have been allowed to waive his right to plead not guilty by reason of insanity, or, to state the same challenge a different way, that Cross's plea was not knowing, voluntary, and intelligent because it was predicated in part on Cross's incorrect belief that he could stop presentation of mental health evidence by pleading guilty. We disagree.
ś 51 The gravamen of Cross's challenge was considered above. We briefly touch on the issue in this context. While counsel wields enormous power within the scope of representation of a client, the goals of litigation remain in the client's hands. Competent defendants have "the absolute right to plead guilty," as long as the plea is knowing, intelligent, and voluntary. State v. Jones, 99 Wash.2d 735, 741, 743, 664 P.2d 1216 (1983); see also Faretta, 422 U.S. at 835, 95 S.Ct. 2525. Cross does not challenge Judge DuBuque's decision that he was competent, and he does not seek to withdraw his plea. Instead, he essentially asks this court to substitute its judgment for the trial judge's, withdraw Cross's plea for him, and impose a not guilty by reason of insanity plea upon him. We decline to do so.
ś 52 Before Judge DuBuque accepted Cross's guilty plea, she was required to, and did, conduct a detailed inquiry and assured herself that Cross was fully informed of the alternatives available to him, that he understood the consequences, and that he freely choose to waive his insanity defense. See Jones, 99 Wash.2d at 745, 664 P.2d 1216 *95 (quoting Frendak v. United States, 408 A.2d 364, 380 (D.C.Cir.1979)); see also RCW 10.77.060(1)(a) (authorizing trial court to sua sponte order a competency hearing). "A defendant is competent to stand trial if he is able to appreciate the nature of the proceedings and to assist with his defense," and, again, competent defendants can disagree with their counsel. Benn, 120 Wash.2d at 662, 845 P.2d 289; Lord, 117 Wash.2d at 901, 822 P.2d 177. Cross was explicitly found to be competent, and his decision to withdraw his plea appears to have been intelligent and voluntary. RP (Sept. 19, 2000) at 33-35; CP at 2146, 2156-62.
ś 53 This was Cross's decision to make. He was informed time and time again of the risks and made his own assessment. Before rendering her decision, Judge DuBuque had an extensive conversation with Cross to assure herself he was fully aware of the gravity of the decision. RP (Sept. 19, 2000) at 1-33; CP at 2144-47. Cross has not shown error.

5. CONTROL OF MITIGATION EVIDENCE
ś 54 Similarly, Cross argues that his constitutional rights were violated when the trial judge allowed expert testimony relating to his mental health to be presented to the jury over his clear and repeated objections. We disagree. Again, counsel has broad authority to determine strategy, even over the client's objections.
ś 55 Substantially similar arguments were recently considered by the Ninth Circuit in Kaczynski, 239 F.3d 1108. Kaczynski argued that his guilty plea was involuntary on the grounds that it was the result of his counsel's insistence on presenting evidence of Kaczynski's poor mental health, and the trial judge's refusal to allow him to proceed pro se or with alternate counsel. Kaczynski, 239 F.3d at 1110. The Ninth Circuit rejected Kaczynski's arguments. Emphasizing that the decision of what evidence to present was a strategy decision vested in the hands of the attorney. Kaczynski, 239 F.3d at 1118.
ś 56 Again, the client controls the goals of litigation. See RPC 1.2. A competent defendant may forbid counsel to put on a mitigation case if his goal is to have the death penalty imposed. E.g., State v. Woods, 143 Wash.2d 561, 23 P.3d 1046 (2001); State v. Sagastegui, 135 Wash.2d 67, 954 P.2d 1311 (1998). However, Cross apparently did not wish to be put to death. Once he has decided the goal, the strategy is largely in the hands of his attorneys.
ś 57 Cross also argues that his attorney/client and doctor/patient privileges were violated when his counsel called mental health experts who had interviewed him on the stand to testify. He analogizes this to the prosecution calling defense counsel to the stand to testify about confidential communications. Cf. State v. Sullivan, 60 Wash.2d 214, 217-18, 373 P.2d 474 (1962) (reversing conviction after prosecution was allowed to examine defense counsel). Generally, communications made to a doctor or psychologist are confidential. RCW 5.60.060; RCW 18.83.110; Sullivan, 60 Wash.2d at 223, 373 P.2d 474. However, only communications originally made in confidence are so privileged. State v. King, 130 Wash.2d 517, 532, 925 P.2d 606 (1996). Examinations that are not done for the purpose of providing treatment but instead solely for forensic purposes are "not within the statutory testimonial prohibitions of the doctor-patient privilege." Sullivan, 60 Wash.2d at 223, 373 P.2d 474 (citing State v. Winnett, 48 Wash. 93, 92 P. 904 (1907)). While a trial court may (and should) properly redact or exclude incriminating statements, such experts may testify about the mental health of the defendant when it is put into controversy by the defense. See, e.g., State v. Brewton, 49 Wash. App. 589, 591-92, 744 P.2d 646 (1987) (trial court properly gave the State access to mental health records when the defendant raised diminished capacity defense).
ś 58 We note that Cross relies on cases where the State has attempted to question defense experts outside of the trial context. In this case, the defense experts were put on by the defense. Cf. State v. Nuss, 52 Wash. App. 735, 742, 763 P.2d 1249 (1988). We have found no court that held that a client's privileges were violated by his own counsel putting on such evidence.
ś 59 Traditionally, the presentation of mental health testimony largely waives the right *96 to keep mental health information privileged. See generally State v. Pawlyk, 115 Wash.2d 457, 800 P.2d 338 (1990). Whether to present this evidence is vested in the hands of defense counsel. While there is considerable academic support (and opposition) to allowing the client to veto the presentation of this evidence, courts have uniformly held that this is counsel's decision, absent ineffective assistance of counsel. See generally LaFAVE ET AL., supra. Holding that the client could prevent the presentation of this evidence in the penalty stage would be a significant change in the law. Cross has not shown that change is warranted.
ś 60 Additionally, Cross argues that Superior Court Special Proceeding Rule (SPRC) 5 authorizes him to control whether mental health evidence may be submitted in the penalty phase. This rule provides that:
Within 24 hours after a jury returns a verdict finding a defendant guilty of aggravated murder in the first degree, the court will require the defendant to elect whether he or she may present expert testimony at the special sentencing proceeding concerning his or her mental condition.
SPRC 5(g). Cross contends that this rule vests the decision in the hands of the defendant personally, rather than in the hands of the defense team. However, he submits no evidence that SPRC 5 was intended to change the general rule that counsel decides whether to submit mental health evidence, not the client, nor whether this rule could have made such a sweeping change to the law as formulated.
ś 61 We hold that the trial court did not err in allowing expert testimony to be submitted as mitigating evidence over Cross's pro se objections.[9]

6. UNANIMITY
ś 62 Cross challenges several jury instructions on the grounds that they improperly pressured the jury to return a unanimous verdict. Though Cross did not challenge these instructions below, we will nonetheless consider his claims. See Lord, 117 Wash.2d at 849, 822 P.2d 177. Claimed instructional errors are reviewed de novo and read in context. Brown, 132 Wash.2d at 605, 940 P.2d 546. We conclude that Cross has not established error.
ś 63 The jury was instructed that:
As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a just verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views and change your opinion if you become convinced that it is wrong. However, you should not change your honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

CP at 1990 (Instruction 9) (emphasis added). The verdict form itself continued:
Having in mind the crimes of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
ANSWER:
[] "YES" (In which case the defendant shall be sentenced to death)
[] "NO" (In which case the defendant shall be sentenced to life imprisonment without the possibility of release or parole)
[] "NO UNANIMOUS AGREEMENT" (In which case the defendant shall be sentenced to life imprisonment without the possibility of release or parole)
CP at 2011. Both are identical to the pattern jury instructions. 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 31.06, at 355, 362 (2d ed.1994).
ś 64 Cross argues that this wording essentially instructed the jury that a nonunanimous decision is not a verdict. He also *97 specifically challenges the verdict form for not combining "no" and "no unanimous agreement." We have substantially rejected this argument already in In re Personal Restraint of Benn, 134 Wash.2d 868, 931-32, 952 P.2d 116 (1998) (evaluating similar instruction, noting that "nothing in the court's instructions said or implied that the defendant could avoid the death penalty only if the jury unanimously answered `no.'"); accord Rupe II, 108 Wash.2d at 763, 743 P.2d 210 (affirming similar jury instruction against similar challenge).
ś 65 This language suggests that unanimity is a goal to be strived toward, not a requirement for a verdict. We want juries to deliberate, not merely vote their initial impulses and move on. Given that the verdict form specifically allowed the jury to select "not unanimous," any theoretical flaw would not have misled the jury into believing that rendering a unanimous verdict was their duty. Further, the trial judge clearly and repeatedly instructed the jury that a unanimous verdict was required to sentence the defendant to death, and a nonunanimous verdict would result in a life sentence. E.g., RP (Feb. 28, 2001) at 4-5; RP (Apr. 4, 2001) at 5. Cross has not demonstrated error.

7. COMMON SCHEME OR PLAN
ś 66 Cross argues the trial judge erred when she declined to give an instruction defining common scheme or plan. We find no error.
ś 67 Claimed errors in jury instructions are generally reviewed de novo. Brown, 132 Wash.2d at 605, 940 P.2d 546. However, it is within the sound discretion of the trial court to determine the appropriateness of granting a request to define words of common understanding. Id. at 612, 940 P.2d 546. Trial courts must define technical words and expressions but not those that are self-explanatory or within ordinary understanding. Id.
ś 68 Cross submitted an instruction that would have defined "common scheme or plan." That jury instruction was substantially similar to one we approved in State v. Kincaid, 103 Wash.2d 304, 692 P.2d 823 (1985). In Kincaid, the defendant killed his wife and her sister with a shotgun and attempted to kill himself. The trial judge instructed the jury in part that:
"The term "common scheme or plan" means that there was a connection or nexus between the murders and the victims thereof. A scheme or plan is a design, method of action, or system formed to accomplish a purpose."
Id. at 314, 692 P.2d 823 (quoting jury instruction).[10] While we recognized that the language was awkward, we concluded that the instruction was not erroneous.
ś 69 However, upholding an instruction given is different from requiring an instruction be given. We have held repeatedly that "common scheme or plan" are words of common understanding requiring no definition. Brown, 132 Wash.2d at 612, 940 P.2d 546; Benn, 120 Wash.2d at 674, 845 P.2d 289; State v. Jeffries, 105 Wash.2d 398, 420, 717 P.2d 722 (1986); State v. Guloy, 104 Wash.2d 412, 417, 705 P.2d 1182 (1985); accord State v. Pirtle, 127 Wash.2d 628, 661-62, 904 P.2d 245 (1995) (holding "common scheme or plan" is not unconstitutionally vague).
ś 70 While the trial court could have given the definition, we find no abuse of discretion in declining to do so.

8. SUPPRESSION OF PHOTOGRAPHIC EVIDENCE
ś 71 Cross challenges the admission of crime scene photos on the grounds they were taken before a warrant was received. We affirm.
ś 72 Five minutes after Cross was arrested, and before obtaining a warrant, the police reentered the house accompanied by medics. CP at 332, 424; RP (Apr. 17, 2000) at 65. The officers confirmed that the victims were dead and took photographs of the crime *98 scene. CP at 331-32. A telephonic warrant was approved about three hours later. Id. It was not based on any information collected during the second entry into the house. CP at 1099. Cross argues that the police exceeded their authority in this second entry, going beyond what is necessary under the "medical emergency" exception to the warrant requirement. The trial court ruled the evidence admissible, and this court reviews for abuse of discretion. CP at 1103; Stenson, 132 Wash.2d at 701, 940 P.2d 1239.
ś 73 First, generally, a defendant who pleads guilty waives appeal "to errors committed prior to arraignment, including an illegal search or seizure." 13 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 3718, at 101 (2004). However, if the error amounts to a violation of due process, it "may constitute a ground for appeal, where, for example, the defendant claims his guilty plea was involuntary. . . [or] from the court's refusal to withdraw a plea of guilty." Id. at 102. Cross does not argue either. Nonetheless, we will consider his claim.
ś 74 Generally, photographs taken by police of a crime scene will be admissible so long as the entry was lawful. State v. Wright, 61 Wash.App. 819, 824, 810 P.2d 935 (1991); cf. Pennsylvania v. Ehrsam, 355 Pa.Super. 40, 52, 512 A.2d 1199 (1986). Under the medical emergency exception to the Fourth Amendment, police may make a warrantless entry into a home as long as the entry is motivated, both subjectively and objectively, by the officer's belief that there is a "need to render aid or assistance." State v. Loewen, 97 Wash.2d 562, 568, 647 P.2d 489 (1982) (citing State v. Prober, 98 Wis.2d 345, 365, 297 N.W.2d 1 (1980), overruled on other grounds by Wisconsin v. Weide, 155 Wis.2d 537, 455 N.W.2d 899 (1990)).
ś 75 Cross argues that the exception does not apply because, based on his stepdaughter's statements to the 911 operator, the officers knew that the victims were dead, and therefore, beyond aid or assistance. But under the circumstances, the police and rescue workers reasonably decided not to rely on the report of a distraught 13-year-old and confirmed that the victims were beyond their aid. CP at 1101; see also RP (Apr. 17, 2000) at 65-66, 75, 93-94. We find no abuse of discretion in admitting the pictures.

9. CUSTODIAL INTERROGATION
ś 76 Cross challenges the admission of several statements he made after he received the Miranda[11] warning, on the grounds he had indicated he wanted questioning to cease. We find no error.
ś 77 If the accused "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602. Cross made many statements to police that were admitted into evidence, most notably an extended interview with Detective Doyon the day of the killings. RP (Apr. 17, 2000) at 16; CP at 1217. Before Cross entered his guilty plea, the trial judge ruled all of his statements admissible. CP at 1353, 1360. Several of the statements he made during this interview were used in the sentencing phase. E.g., RP (May 8, 2001) at 31, 48. On appeal, his appellate counsel challenges admission. We review the decision to admit the statements for abuse of discretion. Stenson, 132 Wash.2d at 701, 940 P.2d 1239.[12]
ś 78 We will recount only a few of the statements, which are representative. After Cross was taken to the police station, he was read his Miranda rights by Detective Doyon. CP at 1218. The following exchange was captured on tape:
Det: DAVID, you have the right to remain silent. Do you understand that? *99 . . . I have to ask you to speak up a little more, so [the tape recorder wi]ll pick it up, okay?
Cross: Yea. I understand my fuckin' rights.
Det: Okay.
Cross: I don't have no fuckin' rights from [now] on. Behind fuckin' bars the rest of my life, I don't give a fuck.
CP at 1316. Detective Doyon continued to go through the Miranda warning, with Cross acknowledging each element of it on tape. CP at 1316-18. At the conclusion, Detective Doyon asked if Cross would talk to him. The following colloquy occurred:
Det: [With] these rights in mind, do you wish to talk to me?
Cross: About what?
Det: Well, I wanna ask you ah, some general questions.
CP at 1318. Cross answered some questions, and declined to answer others, in a somewhat equivocal fashion. For example, when asked if he had drank a bottle of wine that day, he replied "I don't know man. I just told [you] that it's . . . Quit asking me some of the fuckin' things, man, will ya?" "You're askin' me too much. My life is over, I don't give a fuck." CP at 1319.
ś 79 The trial court properly found that Cross's equivocal protests had not effectively asserted his right to remain silent. CP at 1359. Selective responses to police questioning will function as a waiver of that right. State v. Wheeler, 108 Wash.2d 230, 238, 737 P.2d 1005 (1987).[13]
ś 80 Further, a guilty plea forecloses appeal except for validity of the statute, sufficiency of the information, jurisdiction of the court, or circumstances surrounding the plea. State v. Saylors, 70 Wash.2d 7, 9, 422 P.2d 477 (1966). Broadly construed, Cross is challenging the circumstances surrounding his plea. However, given that he does not seek to withdraw his plea, any defect in the circumstances would have to be striking to be cognizable.
ś 81 Instead, Cross argues that the alleged search and seizure errors, and the alleged violation of his Miranda rights, together resulted in cumulative error, denying him a fair trial. See State v. Coe, 101 Wash.2d 772, 789, 684 P.2d 668 (1984) (numerous errors, harmless standing alone, can deprive a defendant of a fair trial); see generally United States v. Necoechea, 986 F.2d 1273 (9th Cir.1993). Even assuming that admitting statements made to his attorney and overheard by police were error, there was insufficient error to deny him a fair trial. See State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000). We affirm.

10. CONSTITUTIONALITY OF WASHINGTON'S DEATH PENALTY
ś 82 Cross makes several challenges to the constitutionality of Washington's death penalty. He argues that the death penalty in Washington is effectively standardless and that our proportionality review does not properly police the use of the penalty. He especially draws our attention to the life sentence of Gary Ridgway and to the United States Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

A. "FREAKISH AND WANTON" APPLICATION AND GARY RIDGWAY
ś 83 Since Cross's trial, the Green River Killer, Gary Ridgway, was caught, prosecuted, and sentenced to life in prison. We cannot begin to calculate the harm his abhorrent murders caused. The fact he will live out his life in prison instead of facing the death penalty has caused many in our community to seriously question whether the death penalty can, in fairness, be proportional when applied to any other defendant.
ś 84 We do not minimize the importance of this moral question. But it is a question best left to the people and to their elected representatives in the legislature. Under the *100 United States Constitution (the only constitution plead here), Washington's death penalty is constitutional and nothing about Gary Ridgway changes that.
ś 85 It may be that there will always be aberrations like Ridgway. We do not believe that these horrific aberrations make a statute unconstitutional. We look at the entirety of first degree aggravated murder prosecutions, not just at whether any particular case is within an order of magnitude of the worst we have known. RCW 10.95.120.
ś 86 We do not agree with those who say that no rational explanation exists for Gary Ridgway escaping a death sentence and Dayva Cross not. See generally Matthew R. Wilmot, Note, Sparing Gary Ridgway: The Demise of the Death Penalty in Washington State? 41 WILLAMETTE L.REV. 435 (2005). Ridgway was spared because a highly respected, honorable, and thoughtful prosecutor made the decision to stay the hand of the executioner in return for information that would otherwise have died some midnight within the walls of the state penitentiary. The information received in return for a life sentence allowed so many families to, at long last, know what happened to their loved ones. While many may disagree with that prosecutor's decision, no one should deny that it was highly rational.
ś 87 Under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny, the death penalty is constitutional only if it is properly constrained to avoid freakish and wanton application. See generally Gregg v. Georgia, 428 U.S. 153, 169, 173, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). To be constitutionally valid, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S. at 189, 96 S.Ct. 2909. We have repeatedly held that our statutes meet this standard. They properly constrain prosecutorial discretion in seeking the death penalty; they properly direct the jury to consider appropriate factors; and they provide for meaningful mandatory appellate review in every case. See Brett, 126 Wash.2d at 210-11, 892 P.2d 29; State v. Rupe, 101 Wash.2d 664, 697-701, 683 P.2d 571 (1984) (Rupe I); cf. In re Pers. Restraint of Brown, 143 Wash.2d 431, 460, 21 P.3d 687 (2001).
ś 88 Our proportionality review is only one way Washington State law prevents arbitrary and capricious application of the death penalty. Other statutory protections may be just as effective.
ś 89 First, the death penalty may only be sought in the most egregious of killings. RCW 10.95.020. This limitation does much to constrain the possibility of arbitrary and capricious application. Second, the prosecutor is instructed to seek the death penalty only when "there is reason to believe that there are not sufficient mitigating circumstances to merit leniency." RCW 10.95.040(1). That requires the prosecutor to consider seriously whether, in any particular case, it would be inappropriate to seek the sentence at all. Third, the State bears the heavy burden of convincing all 12 jurors that the death penalty is appropriate. RCW 10.95.060(4). Unanimity sets a high threshold. Fourth, Washington juries are informed that if they do not recommend a death sentence, the defendant will automatically be sentenced to life in prison without the possibility of parole. RCW 10.95.030(1), .080(2). This assures the jurors that if they exercise mercy, a brutal killer will not someday be set free. Fifth, the jurors are asked whether they are "convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency." RCW 10.95.060(4). This gives the defense considerable opportunity to plead for mercy on any theory they can conceive or that the facts support. Sixth, jurors are specifically instructed to consider eight separate, but nonexclusive, criteria in deciding whether mercy is warranted. RCW 10.95.070. This ensures that jurors' will have their attention drawn to specific reasons to exercise mercy. Seventh, we collect data on all death-eligible convictions. RCW 10.95.120. This allows us and other interested parties to analyze the actual patterns and practices of capital sentencing. Finally, the legislature has directed this *101 court to review all death sentences, whether or not the defendant would otherwise appeal, to independently review the evidence supporting a death sentence and to determine whether the sentence is disproportionate. RCW 10.95.100, .130. Should a death penalty be the result of arbitrary and capricious conduct, the defendant will have a meaningful opportunity to get relief from the highest court in the state.
ś 90 Ridgway's abhorrent killings, standing alone, do not render the death penalty unconstitutional or disproportionate. Our law is not so fragile. But his killings are not irrelevant to our analysis, and will be considered as part of our statutorily mandated review of every future death penalty case.

B. BUSH v. GORE
ś 91 Cross also argues that the statute delegates too much authority to local prosecutors to decide who is eligible for the death sentence. This is a variant of arguments made to this court many times. E.g., Benn, 120 Wash.2d at 667, 845 P.2d 289 (rejecting argument and collecting cases); Rupe I, 101 Wash.2d 664, 683 P.2d 571 (grant of discretion to prosecutors does not result in standardless application); cf. Gregg, 428 U.S. 153, 96 S.Ct. 2909 (affirming constitutionality of Georgia's death penalty).
ś 92 Since we decided these cases, the United States Supreme Court has looked disapprovingly at the various exercises of discretion by county officials in applying state law. See Bush, 531 U.S. 98, 121 S.Ct. 525. In Bush, the Supreme Court halted ballot recounts that would have been done under procedures outlined by the individual counties. The court explicitly stated it was not deciding whether counties could have different standards, but whether a state supreme court with the power to mandate uniformity erred in failing to require uniformity. Id. at 109, 121 S.Ct. 525. While the Supreme Court attempted to severely limit the scope of its holding, Id., it has obvious implications every time state law vests discretion in the hands of county officials. It is clear to us that counties in Washington do have different standards for when they seek the death penalty, given the distribution of cases across the state.
ś 93 But we have already found that this prosecutorial discretion does not offend equal protection.
[T]he grant of discretion to prosecutors does not result in a standardless death penalty statute. The court may assume that prosecutors exercise their discretion in a manner which reflects their judgment concerning the seriousness of the crime or insufficiency of the evidence. Consequently, the prosecutor's decision not to seek the death penalty, in a given case, eliminates only those cases in which juries could not have imposed the death penalty. We believe that this analysis accurately portrays the function prosecutorial discretion plays in our death penalty statute. This discretion is not unconstitutional.
Rupe I, 101 Wash.2d at 700, 683 P.2d 571; accord State v. Campbell, 103 Wash.2d 1, 26, 691 P.2d 929 (1984).
ś 94 On the other hand, underlying Bush is the principle that regularity in some things is too important to leave to the discretion of county officials. Reasonably, it is more important to establish regularity in the imposition of the death penalty than the method of recounting ballots. Mistakes made in the former are permanent and irreversible, while mistakes in the latter have only a temporary effect that can be corrected. When this court decided previous cases, this principle had not been so clearly pronounced. E.g., Rupe I, 101 Wash.2d at 700, 683 P.2d 571.
ś 95 However, at this time, we decline to apply the principles annunciated in Bush outside of election law. The Supreme Court clearly indicated it did not intend application outside of that narrow realm. Bush, 531 U.S. at 109, 121 S.Ct. 525. There are good reasons to vest this discretion in the hands of local officials in the local area. Cross has not established that doing so here was constitutional error.[14]

*102 11. STATUTORY REVIEW
ś 96 The legislature has directed the court to review every death penalty to ensure that it meets statutory standards. We must decide:
(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4) ["Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"]; and
(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120;
(c) Whether the sentence of death was brought about through passion or prejudice.
RCW 10.95.130(2). For ease of analysis we will first consider his sufficiency arguments before turning to the statutory factors of his other challenges.

A. SUFFICIENCY
ś 97 Cross argues that there was insufficient evidence to support his death sentence. He also argues more specifically that there was insufficient evidence of premeditation or of a common scheme or plan to justify the verdict. We review the evidence "in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt." Brown, 132 Wash.2d at 551, 940 P.2d 546. We find sufficient evidence.
ś 98 i. Premeditation. Cross was never found guilty beyond a reasonable doubt and did not plead guilty unconditionally. He specifically denied in his plea both premeditation and the existence of a common scheme or plan. CP at 1651-56. At the time the plea was entered, the prosecution had no direct evidence that Cross premeditated the murders. The trial judge merely concluded that there could have been enough evidence to find premeditation based on her review of the facts. RP (Oct. 23, 2000) at 191-92.
ś 99 Our review of the evidence shows sufficient circumstantial evidence to uphold the trial judge's decision. See generally CP at 1212-1625 (evidence submitted in support of plea). Cross killed three people with two knives. He stabbed one stepdaughter 22 times. RP (May 8, 2001) at 34-36. Multiple blows are strong evidence of premeditation. See State v. Clark, 143 Wash.2d 731, 769, 24 P.3d 1006 (2001). Furthermore, the trial court conducted a searching review of the evidence before accepting the Alford plea. See RP (Oct. 23, 2000) at 5-191. She reviewed evidence from which a rational trier of fact could find premeditation: the location and severity of the wounds, the evidence of domestic violence leading up to the murders, the planning and use of the murder weapons, the evidence of secondary assault, the statements made by Cross to the surviving victim, and the evidence of forced entry. Id.
ś 100 Cross was not prevented from arguing lack of premeditation, and it was an issue at the sentencing phase. E.g., RP (Apr. 11, 2001) at 27 (State's opening statement asserting that Cross acted with premeditation); Id. at 45 (defendant's opening statement denying premeditation). There was sufficient evidence for a jury to have found (or not found) premeditation.[15]
ś 101 ii. Common Scheme or Plan. Similarly, Cross argues that there was insufficient evidence that the killings were committed *103 pursuant to a common scheme or plan, and therefore, his death sentence must be vacated and the case returned for a rehearing. See RCW 10.95.020(10)(making "common scheme or plan" an aggravator). We disagree. There was sufficient evidence of a common scheme or plan for the trial judge to accept the guilty plea, and sufficient evidence for a jury to find common scheme or plan beyond a reasonable doubt.
ś 102 A common scheme or plan exists when there are multiple murders with a nexus connecting them, such as an overarching purpose. State v. Finch, 137 Wash.2d 792, 975 P.2d 967 (1999). "`A scheme or plan is a design, method of action, or system formed to accomplish a purpose.'" Kincaid, 103 Wash.2d at 314, 692 P.2d 823 (quoting jury instructions). Sophisticated pre-planning is not required; the State must only prove an "overarching" plan with a criminal purpose that connects the murders, not that the defendant premeditated to kill multiple or named victims, or to kill victims for the same reason. Pirtle, 127 Wash.2d at 663, 904 P.2d 245; Finch, 137 Wash.2d at 835, 975 P.2d 967.
ś 103 In Pirtle, we affirmed that a common scheme existed where the defendant had planned to rob and kill one employee at Burger King in revenge for being fired. We found that the second murder of another employee who was working at the time was sufficiently connected to the overarching plan. Pirtle, 127 Wash.2d at 663, 904 P.2d 245. Similarly in Finch, we held the jury could have found the killings were part of a common scheme where the defendant's actions and statements prior to and during the murder indicated that with premeditation he had killed his ex-wife, her male friend, and anyone else who "got in the way." Finch, 137 Wash.2d at 836, 975 P.2d 967; see also Guloy, 104 Wash.2d at 418, 705 P.2d 1182.
ś 104 Cross distinguishes his case from those where the court has found a defendant guilty of executing an overarching criminal plot, such as murdering victims during a robbery (Pirtle), theft (Jeffries v. Wood, 114 F.3d 1484 (9th Cir.1997)), rape (Woods), or burglary (Finch). While it is true that most of these defendants killed while pursuing other criminal goals, the definition of "common scheme" does not require that the overarching criminal plan be other than murder itself. RCW 10.95.020(11) provides a separate aggravating factor for a murder committed while carrying out another felony. This suggests that RCW 10.95.020(10) was designed to apply to situations where the defendant killed multiple victims for one purpose.
ś 105 There was sufficient evidence of a common scheme or plan. Cross killed three people at nearly the same time, with the same weapons, in the same home.
ś 106 iii. Overall Sufficiency. Any relevant evidence that "'in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability'" is admissible and must be considered by the jury before it may render a verdict. State v. Bartholomew, 101 Wash.2d 631, 647, 683 P.2d 1079 (1984) (quoting BLACK'S LAW DICTIONARY 903 (5th ed.1979)), appeal after remand, 104 Wash.2d 844, 710 P.2d 196 (1985), judgment rev'd on alternate grounds sub nom. Wood v. Bartholomew, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). "The mere presence of mitigating factors does not require that the jury grant leniency, if the jurors are convinced that the circumstances of the crime outweigh the mitigating factors." State v. Dodd, 120 Wash.2d 1, 25, 838 P.2d 86 (1992) (citing State v. Rice, 110 Wash.2d 577, 624, 757 P.2d 889 (1988)).
ś 107 In this case, Cross offered four mitigating factors: his near-lack of criminal history, the "extreme mental disturbance" he was under at the time, the fact he was unlikely to be a danger to others in the future, and his underlying mental disease or defect. RP (Apr. 11, 2001) at 48. A jury could have granted him mercy based on these factors. However, Cross also brutally killed three family members and held a child against her will for many hours. RP (May 8, 2001) at 34-36. Additionally, there was evidence that Cross had a history of domestic violence. RP (Apr. 21, 2001) at 41. There was sufficient evidence submitted to justify the jury's verdict.

*104 B. PROPORTIONALITY

ś 108 We must decide "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). We compare this case to other death eligible cases. RCW 10.95.120.
ś 109 We recognize that the court's approach to this analysis has taken many forms. Ten years ago, Justice Barbara Durham identified six separate approaches that had been taken in recent memory. See Brett, 126 Wash.2d at 214-216, 892 P.2d 29 (Durham, C.J., concurring). However, the goal has remained the same, and the evolution of the analysis has not undermined the purpose of the review. The goal is to ensure that the sentence, in a particular case, is proportional to sentences given in similar cases, is not freakish, wanton or random; and is not based on race or other suspect classifications. See generally Furman, 408 U.S. 238, 92 S.Ct. 2726; Stenson, 132 Wash.2d at 758, 940 P.2d 1239. Our approach will continue to be refined over time and will vary depending on the particulars of the cases before the court.
ś 110 At a minimum, we will consider: (1) the nature of the crime, (2) the aggravating circumstances, (3) criminal history, and (4) personal history. Pirtle, 127 Wash.2d at 686, 904 P.2d 245; but cf. Sagastegui, 135 Wash.2d at 92, 954 P.2d 1311. We will also consider substantive challenges to the proportionality of the sentence, as raised. Cf. State v. Elledge, 144 Wash.2d 62, 80, 26 P.3d 271 (2001); State v. Harris, 106 Wash.2d 784, 798, 725 P.2d 975 (1986).
ś 111 i. Nature of the Crime. We begin by comparing the specifics of this crime with other death eligible crimes. E.g., Brown, 132 Wash.2d at 556, 940 P.2d 546. Cross killed his wife and two family members. Counsel calls our attention to at least 22 similar cases where the defendant received life in prison, including cases that were arguably objectively worse that resulted in a life sentence. E.g., State v. Blackwell, No. 96-1-00676-3 (Snohomish County Super. Ct. June 24, 1996) (defendant shot and killed his pregnant wife and two companions in the King County Courthouse).
ś 112 Cross's counsel asserts that the only intrafamily killing that has actually resulted in the death penalty was Clark Elmore, who "brutally raped and tortured his step daughter" before killing her. State v. Elmore, 139 Wash.2d 250, 308, 985 P.2d 289 (1999). They are correct that the death penalty, historically, has not often been sought in these cases. See, e.g., State v. Price, No. 01-1-04749-5 (Pierce County Super. Ct. Aug. 9, 2002) (killed mother of his child; death penalty not sought); State v. Washington, No. 94-1-01997-1 (Pierce County Super. Ct. May 22, 1995) (solicited accomplices to kill mother; death penalty not sought); State v. Allen, No. 00-1-00235-9 (Cowlitz County Super. Ct. Oct. 30, 2002) (killed mother, death penalty not sought); State v. Hacheney, No. 01-1-01311-2 (Kitsap County Super. Ct. Feb. 7, 2003) (pastor killed wife, death penalty not sought); contra Stenson (husband killed wife and business partner: State sought, and jury returned, death sentence).
ś 113 However, the fact that state prosecutors may be changing their assessment of whether domestic violence resulting in death warrants seeking a capital sentence does not render the death penalty in this case disproportional. Again, the touchstone is whether the penalty in a particular case is freakish and wanton or given for a forbidden reason. Changing assessments are not necessarily freakish, wanton, or forbidden.
ś 114 Death sentences have been received in other cases with few victims. In Woods, this court found the death sentence proportional when the defendant killed two acquaintances with whom he had had a prior relationship. Woods, 143 Wash.2d at 616, 23 P.3d 1046. In Stenson, the defendant killed his wife and business partner. Stenson, 132 Wash.2d at 759, 940 P.2d 1239. While Elledge did not kill family members, he killed a long term acquaintance and fellow church member. Elledge, 144 Wash.2d at 66, 26 P.3d 271.
ś 115 There was a marked level of cruelty in this case. At least one of Cross's victims was conscious and pleaded with him *105 to either spare her life or kill her more quickly. RP (May 8, 2001) at 34-36. A "`brutal murder involving substantial conscious suffering of the victim makes the murder more deserving of the death penalty.'" Elledge, 144 Wash.2d at 81, 26 P.3d 271 (quoting Stenson, 132 Wash.2d at 759, 940 P.2d 1239) (citing State v. Gentry, 125 Wash.2d 570, 657, 888 P.2d 1105 (1995)). On the other hand, we recognize that the death penalty has not been sought in cases at least as brutal. State v. Kennedy, XX-X-XXXXX-X (Skagit County Super. Ct. Oct. 28, 2002) (stabbed victim more than 100 times); State v. Ridgway, XX-X-XXXXX-X SEA (King County Super. Ct. Dec. 18, 2003) (defendant killed at least 48 and probably more than 60 women, mostly by strangling immediately after sexual intercourse); State v. Webbe, XX-X-XXXXX-X SEA (King County Super. Ct. Jan. 27, 2003) (defendant raped and stabbed woman to death); (death penalty not sought); State v. Thornton, XX-X-XXXXX-X (Benton County Super. Ct. Jan. 6, 1999) (shot, beat with rocks, and stabbed victim).
ś 116 Our society is loosing its tolerance for domestic violence. We cannot say the prosecutor's decision to prosecute, and the jury's decision to sentence, were disproportionate based on the nature of the crime and its resemblance to other death eligible crimes.
ś 117 ii. Aggravating Circumstances. Here, we are not merely looking for the number of aggravators, but more importantly, at the nature of the aggravating circumstances. Cf. Elledge, 144 Wash.2d at 81, 26 P.3d 271; Brown, 132 Wash.2d at 558, 940 P.2d 546; see also Kennedy, No. 02-1-00511-9 (two aggravators, death penalty not sought); State v. Kinney, No. 98-1-01049-8 (Whatcom County Super. Ct. Jan. 14, 2002) (four aggravators, death penalty not sought); State v. Garrett, No. 02-1-00264-2 (Chelan County Super. Ct. Feb. 24, 2003) (three aggravators; death not sought).
ś 118 We recognize that many defendants who received a life sentence had the same single aggravator of a common scheme or plan. Most notoriously, Gary Ridgway. Ridgway, No. 01-1-10270-9 SEA (defendant killed at least 48 women over many years); see also State v. Cruz, XX-X-XXXXX-X SEA (King County Super. Ct. Mar. 25, 2002).
ś 119 In this case, the aggravating factor was the murder of multiple victims as part of a common scheme or plan. This was sufficient to meet the statutory qualification. However, in this case, it does not weigh for or against a decision that the penalty is proportional.
ś 120 iii. Criminal History. Cross had only one prior conviction. While most of those sentenced to death had significant criminal histories, a lack of significant criminal history does not render the sentence disproportional. Elmore, 139 Wash.2d at 309-10, 985 P.2d 289 (collecting cases); Elledge, 144 Wash.2d at 82-83, 26 P.3d 271 (collecting cases and noting five death sentences were found proportional for defendants with little or no criminal history); but see Price, No. 01-1-04749-5 (trial judge specifically noted death penalty not sought because of lack of criminal history); State v. Chea, No. 98-1-03157-5 (Pierce County Super. Ct. June 28, 2002); Allen, No. 00-1-00235-9.
ś 121 We cannot say, based on this, that the death penalty is disproportionate given Cross's relative lack of criminal history.
ś 122 iv. Personal History. Cross's personal history contains elements that both tend to support the jury's verdict and argue in favor of mercy. However, abusive childhood and medically diagnosed personality disorders (that do not rise to the level of competence-destroying mental illness) do not necessarily render a death penalty disproportionate, though they are certainly grounds for the jury to show mercy. Brown, 132 Wash.2d at 559, 940 P.2d 546; Pirtle, 127 Wash.2d at 668, 904 P.2d 245; Dodd, 120 Wash.2d at 11, 838 P.2d 86; Lord, 117 Wash.2d at 906, 822 P.2d 177; Rice, 110 Wash.2d at 592-96, 757 P.2d 889.
ś 123 v. Gary Ridgway. We recognize that Ridgway brutally murdered at least 48 women (and possibly many more), over decades, often returning to rape their corpses, and yet was spared the death penalty under a plea bargain. We also recognize that the people of Washington gained considerable *106 benefits from this plea bargain. It resolved the tragedy of many unsolved deaths and disappearances that probably would have otherwise remained unsolved forever. Families were spared the agony of unknowing and the rigors of testimony. See Statement of Norm Maleng, attached to Ridgway, Trial Judge Report, No. 01-1-10270-9 SEA.
ś 124 Gary Ridgway is but a single case, an instance of what we hope were unique and horrible crimes. Each death sentence is the product of unique circumstances. The issue before us is whether the sentence of death for Cross is disproportionate to the penalty imposed in similar cases. Ridgway, standing alone, is not sufficient reason to find capital sentences always disproportionate.

C. PASSION OR PREJUDICE
ś 125 Cross argues that his sentence was brought about after counsel appealed to the passions and prejudices of the jury. We disagree.
ś 126 We will vacate sentences that were the product of appeals to the passion or prejudice of the jury, such as "arguments intended to `incite feelings of fear, anger, and a desire for revenge' and arguments that are `irrelevant, irrational, and inflammatory . . . that prevent calm and dispassionate appraisal of the evidence.'" Elledge, 144 Wash.2d at 85, 26 P.3d 271 (quoting BENNETT L. GERSHMAN, TRIAL ERROR AND MISCONDUCT § 2-6(b)(2), at 171-72 (1997)). Calling the defendant a liar, implying witnesses are not believable because they were from out of town, and asserting that the State would give the defendant a gun and send him down the elevator with the jury if they acquitted are all improper appeals. Elledge, 144 Wash.2d at 85, 26 P.3d 271 (collecting cases). Nothing like that was present here.
ś 127 Cross argues that the extrinsic evidence submitted regarding his single prior crime was as inflammatory as the extrinsic evidence that led this court to reverse the death penalty in Clark, 143 Wash.2d at 780-81, 24 P.3d 1006. However, in Clark, the trial court allowed a police officer to testify about the details of Clark's prior conviction during the State's sentencing case in chief. Id. at 777-78, 24 P.3d 1006. The trial judge had excluded this testimony as inadmissible during the guilt phase, but believed the standards for evidence supporting aggravating factors was looser during the sentencing phase. Id. This was error; under Pirtle, only the fact of the conviction and the elements of the offense are admissible in the State's sentencing case in chief. The police officer's testimony went far beyond the facts of the conviction and the elements of the crime. His assertion that the defendant preyed on "the weak and the small" was clearly inflammatory. See Clark, 143 Wash.2d at 782, 24 P.3d 1006 (quoting trial record).
ś 128 Cross also argues that the mental health evidence was used in an inflammatory way to convince the jury that Cross was extraordinarily dangerous. However, he does not identify specifically what testimony or argument he believed appealed to the jury's passion or prejudice, and our review of the record has not identified anything that stands out.
ś 129 We find no improper appeals to the passions or prejudices of the jury.

D. METHODOLOGICAL CHALLENGES
ś 130 Cross also challenges the methodology of our proportionality review. How to properly perform proportionality review, and upon what data, is a reoccurring, vexing problem in capital case jurisprudence across the nation. See generally State v. Loftin, 157 N.J. 253, 724 A.2d 129 (1999) (reviewing history and variations of proportionality review; suggesting sophisticated methodologies are necessary; finding expert assistance necessary); see also Timothy V. Kaufman-Osborn, Capital Punishment, Proportionality Review, and Claims of Fairness (With Lessons From Washington State), 79 WASH. L.REV. 775 (2004) (cogently criticizing current proportionality review); Bruce Gilbert, Comparative Proportionality Review: Will the Ends, Will the Means, 18 SEATTLE U.L.REV. 593, 613 (1995). Federal courts have consistently emphasized that any proportionality review must be conducted consistent with the due process clause. See Palmer v. Clarke, 293 F.Supp.2d 1011, 1040 *107 (D.Neb.2003) (citing Kilgore v. Bowersox, 124 F.3d 985, 995 (8th Cir.1997)). With that in mind, we turn to his specific challenges.
ś 131 i. Comparative Cases. Cross notes that in nearly every case where this court has found the penalty was proportional, the verdict or conviction was later vacated or overturned. See Br. of Appellant at 220-21 (listing 16 cases where a death sentence has been vacated). He argues that this dramatically skews the sample group. He notes that in In re Personal Restraint of Brett, 142 Wash.2d 868, 880-83, 16 P.3d 601 (2001), this court acknowledged that Brett's representation was so poor that the sentence might have been different, which also renders the case seriously subject to doubt.
ś 132 The legislature has directed this court to review "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). While this is not without doubt, we believe the legislature intended us to consider whether a death sentence is disproportional based on other sentences imposed, not other sentences executed.
ś 133 We recognize that federal cases frequently speak of the administration of capital punishment, not merely the sentencing. E.g., Callins v. Collins, 510 U.S. 1141, 1155-57, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). As administered, the universe of capital cases with which to compare Cross's sentence is very different. It consists of only four men; three of which effectively elected not to contest the penalty of death. However, based on the statutory language itself and absent a clear challenge to the constitutionality of the universe of comparison, we will use as a base line capital sentences rendered by juries, not capital sentences executed.
ś 134 ii. Completeness of the Database. This court is directed to have a complete database of critical factors relating to death eligible crimes, whether or not the death penalty was sought. RCW 10.95.120. We recognize that our database of comparable cases has not been timely and faithfully updated by trial courts as required by the statute, and contains many omissions. Many reports were filed years late and are missing data on everything from ethnicity to the mental health of the defendant. See State v. Mason, No. 01-1-03569-6 SEA (King County Super. Ct. July 28, 2003); Chea, 98-1-03157-5; State v. Sayasack, XX-X-XXXXX-X (Pierce County Super. Ct. May 22, 1995); State v. Allison, XX-X-XXXXX-X (Pierce County Super. Ct. Apr. 10, 1995); State v. Carter, XX-X-XXXXX-X (Pierce County Super. Ct. Sept. 21, 1998); State v. Roberts XX-X-XXXXX-X (Clallam County Super. Ct. Nov. 14, 2002); Garrett, XX-X-XXXXX-X; Hacheney, XX-X-XXXXX-X. At least one trial judge expressed palatable anguish in his inability to provide this court with a completed report, based on counsel's failure to assist the judge in gathering the data. See State v. Lambert, XX-X-XXXXX-X (Grant County Super. Ct. Dec. 10, 1997).
ś 135 Trial judge reports serve as the basis for the Supreme Court's proportionality review of convictions for first degree aggravated murder. Cross argues that the failure of the trial courts to provide timely and reliable reports to the Supreme Court undermines the credibility of the proportionality review.
ś 136 We recognize the gravity of the charge. However, we must decide whether Cross is entitled to relief on this basis. We conclude he is not, at least absent a credible showing that these failures have caused him some injury.
ś 137 The database is now overwhelmingly complete. There is an ample amount of detail we can use to compare this case with the others collected, and we have no reason to think that the omitted reports would not be consistent with the completed ones.
ś 138 iii. Standards. Again, Cross charges that our proportionality review is essentially standardless. We have previously considered and rejected this argument. Brown, 132 Wash.2d at 554, 940 P.2d 546; Pirtle, 127 Wash.2d at 685-86, 904 P.2d 245; Gentry, 125 Wash.2d at 654-58, 888 P.2d 1105; Lord, 117 Wash.2d at 909-11, 822 P.2d 177; see also Benn, 120 Wash.2d at 699, 845 P.2d 289 (Utter, J., dissenting).
*108 ś 139 We recognize that a federal court has found our review to be constitutionally inadequate under Furman because it did not meaningfully police the application of the death penalty. Harris ex rel. Ramseyer v. Blodgett, 853 F.Supp. 1239, 1288-91 (W.D.Wash.1994), aff'd sub nom. Harris ex rel. Ramseyer v. Wood, 64 F.3d 1432 (9th Cir.1995). Specifically, the federal courts found that: (1) the statute does not define what cases are "similar" or whether the court can consider additional factors, (2) there is no notice to defendant about which cases the court will treat as similar, (3) the statute provides no alternate procedure when no similar cases are found, (4) the statute does not provide a standard for reviewing the similar cases, and (5) the sentence review has no established fact finding procedure. Harris, 853 F.Supp. at 1288-91. However, we have already considered and rejected the federal court's criticism. See Restraint of Benn, 134 Wash.2d at 925-26, 952 P.2d 116, habeas corpus granted on other grounds sub nom. Benn v. Wood, 2000 WL 1031361, 2000 LEXIS 12741 (W.D.Wash.2000), aff'd sub nom. Benn v. Lambert, 283 F.3d 1040 (9th Cir.2002).
This "disproportionality" review is not subject to the challenges raised by Brett and those upheld in Harris v. Blodgett, supra. Using the legislative definition of `similar cases' alleviates the due process concerns expressed in Harris v. Blodgett, supra. Refocusing the review to ascertain only whether a death sentence is wanton and freakish based upon the broad range of aggravated murder cases provides a more reliable and justifiable standard of "disproportionality" and renders negligible the effect of slight deviations in the universe of "similar cases". The function of the review is limited to providing "additional assurance" that a sentence is not disproportionate, rather than ensuring proportionality in the first instance. See Gregg, 428 U.S. at 206-07, 96 S.Ct. 2909. That function is inherent in the guidelines contained in RCW 10.95. In addition, this method of review does not require the parties or the court to ascertain, in essence, mathematical proportionality. There is no constitutional or statutory requirement to ensure an unattainable degree of identity among particular cases which are invariably unique.
Brett, 126 Wash.2d at 212-13, 892 P.2d 29. Accordingly, we need not define "similar cases" with scientific precision because we have no statutory obligation to derive a narrow definition. The legislature has not instructed us otherwise.
ś 140 iv. Counties. Cross also argues that the death penalty is flawed because it is imposed by only wealthy counties. However, he did not submit sufficient evidence in support of these claims for us to analyze that challenge at this time. We note that funds are available to reimburse counties prosecuting such cases if the legislature so directs. RCW 43.330.190, .200.
ś 141 We hold there was sufficient evidence to support the verdict, that the verdict was proportional, and that it was not the product of passion or prejudice.[16]

CONCLUSION
ś 142 This case requires that we decide whether the State may deliberately and lawfully take this man's life. Such decisions rank high among the most difficult and important that any judge, or any juror, will ever make. Our review is limited to determining whether Cross has demonstrated reversible error in the State's exercise of its power to take life, not whether, as individuals, we agree or disagree with the people's decision to keep death as the ultimate punishment for crime.
ś 143 We affirm the trial court's decision to excuse the four jurors from the jury pool. Cross has not established he was denied the benefit of his Alford plea by the lack of an unsought premeditation instruction. The trial court properly accepted Cross's Alford plea. He has not shown his right to representation was denied by the strategy differences between him and his counsel, nor that he should have been appointed new counsel *109 or allowed to proceed pro se. Evidence about Cross's mental health was properly presented to the jury. The jury was not improperly pressured into unanimity. The trial judge properly declined to instruct the jury on the meaning of common scheme or plan and properly admitted the challenged photographic evidence and out of court statements made by Cross. Cross has not established that the Washington death penalty is unconstitutional. We find that the sentence of death is proportional and meets statutory standards.
ś 144 Accordingly, we affirm Dayva Cross's sentence of death.
ALEXANDER, C.J., BRIDGE, FAIRHURST, JJ., and IRELAND, J.P.T., concur.
ALEXANDER, C.J. (concurring).
ś 145 The majority opinion lavishes praise on the "highly respected, honorable, and thoughtful" prosecutor who negotiated an agreement whereby he did not seek the death penalty against Gary Ridgway in exchange for the serial killer providing certain information. Majority at 100. With equal fervor, the dissent asserts that there was "nothing rational" about the prosecutor's plea deal with Ridgway. Dissent at 113 n. 8.
ś 146 This court should refrain from commenting on the qualities of individual prosecutors, as that is a matter properly within the purview of the public and not justices. Ridgway's sentence, and the considerations that led to the sparing of his life, are not before us. Therefore, while I concur with the majority's result, I write separately simply to express my view that both the majority and dissenting opinions needlessly and improperly delve into matters of prosecutorial discretion. While we may have personal views about controversies beyond our docket, such views do not belong in the decisions announced by this court.
FAIRHURST, J., concurs.
C. JOHNSON, J. (dissenting).
ś 147 The majority abandons any rational attempt to fulfill our statutory responsibility to conduct a proportionality review, effectively rendering the statutory duty meaningless. Properly recognizing and analyzing what has happened in the administration of capital cases in this state inevitably leads to the conclusion that the sentence of death in this case, and generally, is disproportionate to the sentences imposed in similar cases. Contrary to what we had expected to find when we established an analytical framework to conduct our statutory review, that the worst of the worst offenders would be subject to the death penalty, what has happened is the worst offenders escape death. When Gary Ridgway, the worst mass murderer in this state's history, escapes the death penalty, serious flaws become apparent. The Ridgway case does not "stand alone," as characterized by the majority, but instead is symptomatic of a system where all mass murderers have, to date, escaped the death penalty.
ś 148 Our task in conducting a proportionality review as provided under RCW 10.95.130(2)(b) requires us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." "Similar cases" is defined within the statute as all "cases reported in Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." RCW 10.95.130(2)(b). RCW 19.95.120 requires the trial court to file a report "[i]n all cases in which a person is convicted of aggravated first degree murder." Thus, the pool of cases we review includes all aggravated murder convictions. One commonality exists in these cases: they are all the worst existing crimes. Proportionality review is intended to provide a basis to explain how a sentence of death rationally compares to the other cases in the pool. Reviewing the history of this court's proportionality review reveals *110 how the administration of capital cases defies any rational analysis.
ś 149 Since the enactment of the statute in 1981, our proportionality jurisprudence has embodied many analytical forms. We first characterized the objective of proportionality review on appeal as "to assure that `wholly arbitrary, capricious, or freakish sentences' are minimized." State v. Campbell, 103 Wash.2d 1, 30 n. 2, 691 P.2d 929 (1984). However, even with this goal in mind, we did not articulate the method by which we were to minimize the imposition of arbitrary or freakish sentences through this proportionality review. In conducting our proportionality review in Campbell, we found no other case where four aggravating factors were present. Thus, rather than comparing Campbell's case with "similar cases" as required under the statute, we concluded that these circumstances "would, with great frequency prompt a jury to impose the death penalty." Campbell, 103 Wash.2d at 30, 691 P.2d 929.
ś 150 Shortly after Campbell, in State v. Jeffries, 105 Wash.2d 398, 717 P.2d 722 (1986), we concluded that proportionality review under RCW 10.95.130(2)(b) does not include cases where the prosecutor did not seek the death penalty. We compared Jeffries' sentence of death with the sentences imposed in four other cases: State v. Rupe,[1]State v. Bartholomew,[2]State v. Hawkins,[3] and State v. Quinlivan.[4] Without significant explanation, we concluded that "[t]hese four cases strongly establish that the death penalty here is not disproportionate." Jeffries, 105 Wash.2d at 430, 717 P.2d 722.
ś 151 In State v. Harris, 106 Wash.2d 784, 798, 725 P.2d 975 (1986), we noted that the proportionality statute provides "little guidance to determine at what point a death sentence becomes proportionate or disproportionate." However, we turned to Georgia's interpretation of its own proportionality statute, which is identical to Washington's statute, as a useful guideline. The test for proportionality in Georgia is to determine whether death sentences have been imposed "generally" in similar cases.
"[T]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally and not `wantonly and freakishly imposed,' . . ."
Harris, 106 Wash.2d at 798, 725 P.2d 975 (quoting Moore v. State, 233 Ga. 861, 864, 213 S.E.2d 829 (1975)). We adopted this standard and have generally employed it in our subsequent proportionality reviews.
ś 152 In 1987, contrary to what we said in Jeffries, we included in the pool of comparable cases all cases in which the defendant was convicted of first degree aggravated murder. In State v. Rupe, 108 Wash.2d 734, 743 P.2d 210 (1987) (Rupe II) we stated, "`similar cases' include cases where the defendant was convicted of first degree aggravated murder regardless of whether the death penalty was sought and imposed." 108 Wash.2d at 767, 743 P.2d 210. Rupe II represented a significant step in our proportionality review. In that case, we singled out a number of cases that presented at least two of the three aggravating factors present in the case before us. After comparing Rupe's case with eight other cases,[5] we concluded that "we do not find any characteristics about Rupe's crime, nor a lack of characteristics *111 found in similar crimes, which suggest that the death penalty is excessive or disproportionate in Rupe's case." Rupe II, 108 Wash.2d at 769-70, 743 P.2d 210.
ś 153 In State v. Lord, 117 Wash.2d 829, 907-14, 822 P.2d 177 (1991), we reviewed the history, impetus, and purpose of the proportionality statute. Acknowledging again that there is no clear test or guidance given to the court in the text of the statute, we concluded that our proportionality statute serves to prevent caprice in deciding whether to impose the death penalty, and, while not constitutionally required, it "provides a safeguard against arbitrarily imposed death sentences." Lord, 117 Wash.2d at 908, 822 P.2d 177. In this process, however, we did not require precise uniformity. "Our review is not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances." Lord, 117 Wash.2d at 910, 822 P.2d 177. We characterized our comparison of similar cases as a search for "family resemblances."
ś 154 In State v. Benn, 120 Wash.2d 631, 678-93, 845 P.2d 289 (1993), we conducted the most extensive search for first degree aggravated murder cases. After a survey of 31 cases from the trial court reports, we selected a pool of comparable cases in the same "genus or family" as Benn's[6] and concluded that this group of similar cases did not contain an arbitrary frequency of life without parole sentences over the death sentence.
ś 155 In State v. Brett, 126 Wash.2d 136, 212, 892 P.2d 29 (1995) (conviction vacated and remanded in In re Pers. Restraint of Brett, 142 Wash.2d 868, 16 P.3d 601 (2001)), we characterized proportionality review as providing "a `check' or `additional assurance' against arbitrary imposition of the death penalty." We noted our struggle in the past in conducting proportionality review and attributed this difficulty to attempting to define "similar cases" without adopting standards requiring mathematical identity. Additionally, we acknowledged that we had struggled to define what makes a case proportional. We stated that proportionality review continues to broaden in approach, and we focused on two systemic problems in death sentences: random arbitrariness and sentences based on the defendant's race.
ś 156 In State v. Pirtle, 127 Wash.2d 628, 687, 904 P.2d 245 (1995), (rev'd in part and remanded in part sub nom. Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.2002)), we abandoned Lord's "family resemblance" test, stating the approach "grew somewhat unwieldy as more and more cases were reported" and "the result was dependant on the cases selected" for comparison. In proportionality review, "we assume [cases] can be arrayed on a rough continuum from least serious to most serious, considering the nature of the crime and any mitigating factors." Pirtle, 127 Wash.2d at 686, 904 P.2d 245. When determining whether Pirtle's death sentence was excessive or disproportionate to the penalty imposed in similar cases, we articulated the proper review as follows:
In reviewing an individual case, we look for disproportionality. We are not concerned with whether a given crime can be matched with one or more of the fifteen other death penalties. Instead, our job is to weed out those cases in which the crime and the defendant's mitigation most closely match the less serious of the 129 cases which did not result in death.

Pirtle, 127 Wash.2d at 686, 904 P.2d 245 (emphasis added). In considering the defendant and the crime, we employed four factors in our examination: (1) the nature of the crime, (2) the aggravating factors, (3) the defendant's criminal history, and (4) the defendant's personal history.
ś 157 In State v. Elmore, 139 Wash.2d 250, 308, 985 P.2d 289 (1999) (quoting State v. Brown, 132 Wash.2d 529, 555, 940 P.2d 546 (1997)), we reaffirmed that our objective in proportionality review is to determine whether "death was imposed `generally in similar cases, and not imposed wantonly and freakishly.'" Unlike our review in Pirtle, however, we stated that "[i]f the facts of Elmore's case *112 are similar to some of the facts taken from cases in which the death penalty was upheld, the proportionality review is satisfied." Elmore, 139 Wash.2d at 308, 985 P.2d 289. We then employed the four factors set out in Pirtle to analyze the defendant and the crime in relation to similar cases, comparing Elmore's case to only those cases in which the death penalty was imposed. Six of the cases we relied on for proportionality review had previously been vacated on appellate review. However, we stated that our reliance on these cases was appropriate because none of them was overturned based on proportionality.
ś 158 In State v. Elledge, 144 Wash.2d 62, 79-80, 26 P.3d 271 (2001), we again rejected the argument that we should include only cases in which the death penalty was ultimately affirmed in our review of "similar cases," relying on Elmore. In Elledge, the defendant was convicted of first degree aggravated murder for strangling and stabbing a woman after binding her wrists and ankles, and the jury imposed the death penalty. In comparing the nature of the crime with other "similar cases," we stated that "Elledge's crime was at least as vicious and brutal as others in which the death penalty was imposed," relying on Rupe, Benn, and Harris. Elledge, 144 Wash.2d at 81, 26 P.3d 271. Although there was only one aggravating factor present, we did not find Elledge's case disproportionate on this basis, citing to State v. Gentry,[7]Harris, and Benn in which the death penalty was upheld where one aggravating factor was found. Elledge had an extensive criminal record, including one first degree murder conviction, which we found to be "among the most extensive of any within the pool of similar cases." Elledge, 144 Wash.2d at 83, 26 P.3d 271. No mitigating factors were presented.
ś 159 Despite the different analytical forms we have employed in our proportionality review since the enactment of RCW 10.95.130(2)(b) in 1981, the ultimate objective of our search for "similar cases" has consistently been to achieve our statutory mandate to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases." In accomplishing this task, we must put a particular case in context; our review is to assure us that the sentence of death is somehow quantifiable or comparable in view of all the other cases where the sentence of death was imposed or where an individual was convicted of first degree aggravated murder. In executing this comparative review, as stated in Pirtle, we expect to find that our pool of comparable cases can "be arrayed on a rough continuum from least serious to most serious, considering the nature of the crime and any mitigating factors." 127 Wash.2d at 686, 904 P.2d 245.
ś 160 Since chapter 10.95 RCW was enacted, four people convicted of aggravated murder in the first degree have been sentenced to death and executed. Three of the individuals executed chose not to pursue the avenues of appeal available to them. In addition, one individual who had been sentenced to death committed suicide while incarcerated. Several individuals are currently sitting on death row awaiting the exhaustion of their appeals. There are approximately 268 trial court reports on file with this court for individuals convicted of first degree aggravated murder.
ś 161 As stated above, from our discussion in Pirtle, we assume the individuals sitting on death row constitute the far end of the spectrum, representing the most serious offenders who committed the most atrocious crimes in our state. However, a review of the current pool of cases reveals serious problems with the administration of our state's capital cases. Contrary to what we expected to find in the "spectrum" of serious cases, we now see that the most serious offenders either pleaded guilty and escaped the death penalty or were not sentenced to death by a jury.
ś 162 Gary Ridgway is the most prolific serial killer in our state's history. In 2003, he pleaded guilty to 48 counts of first degree aggravated murder. He killed mainly prostitutes *113 and runaways, often strangling them, dumping their bodies to return later to rape their corpses. Ridgway's plea was part of an agreement forged with prosecutors in which he agreed to help locate the remains of the women he killed in order to escape the death penalty. He was sentenced to life without the possibility of parole.[8]
ś 163 If the Ridgway case was the only case at the far end of the spectrum, perhaps his penalty of life in prison rather than death could be explained or dismissed. Ridgway, however, is not the only case in which a mass murderer escaped death. Benjamin Ng killed 13 people, resulting in 13 convictions of first degree aggravated murder. The aggravating factors found in his case were: the murders were part of a common scheme or plan, there was more than one victim and the murders were committed in the course of a robbery. Ng hog-tied his victims prior to shooting them execution style. Mitigating factors presented to merit leniency were diminished capacity, Ng's youth, and lack of a prior criminal record. The jury could not unanimously agree to impose the death penalty, and Ng was sentenced to life in prison without the possibility of parole.
ś 164 In addition to Ridgway and Ng, who were not initially sentenced to death, over the course of time an overwhelming number of the cases we have relied on as "similar cases" where death was imposed for the purposes of proportionality review have been vacated on appeal. The death penalty has not been imposed on remand in any of these cases even though a number of them constitute the most atrocious crimes by the most serious offenders. Since the enactment of the existing death penalty statute in 1981, juries have imposed the penalty of death in 31 cases where an individual was convicted of first degree aggravated murder. However, in 19 of those 31 cases the conviction or sentence has been vacated by either the Washington State Supreme Court or by federal courts. In at least 13 cases, the individual was resentenced to life without the possibility of parole on remand.[9] Several cases are still pending in superior courts. One of the 19 individuals was released,[10] and one committed suicide.[11] Even though our previous cases have relied on cases where the death penalty was not reimposed, the fact remains that these cases are, or should be, placed at the far end of the most extreme crimes for purposes of our comparison. These cases no longer involve the death penalty.
ś 165 Among those retried and sentenced to life without parole are two individuals convicted of killing three or more persons. Kwan Fai Mak, Ng's codefendant, committed 13 murders and was sentenced to death in the sentencing phase of his first trial. However, Mak was sentenced to life without the possibility of parole after his sentence was vacated and a new sentencing proceeding was held. David L. Rice was convicted of four counts of first degree aggravated murder. His conviction and sentence of death were overturned by the Ninth Circuit Court of Appeals, Rice v. Wood, 44 F.3d 1396 (9th Cir.1995). Rice subsequently pleaded guilty and was sentenced to life without the possibility of parole. Again, the State elected not to seek the death penalty on remand.
ś 166 Robert Yates pleaded guilty to 13 counts of premeditated first degree murder, not aggravated murder, in Spokane County pursuant to an agreement with prosecutors. Yates pleaded guilty in order to escape the death penalty. Like Ridgway, Yates was a serial killer who preyed on prostitutes. He hired prostitutes for sex then shot them in the head and stole their money. In addition to his convictions in Spokane County, Yates was later convicted of two counts of first *114 degree aggravated murder in Pierce County where the prosecutor sought and the jury imposed the death penalty. Thus, the only trial court report on file by which we can conduct our proportionality review under the statute is for the two aggravated murder convictions in Pierce County. Though aggravating factors were apparently present, the prosecutor in Spokane County allowed Yates to plead guilty to 13 counts of premeditated first degree murder, rather than first degree aggravated murder, therefore the Spokane County case is not included under the statute. It is well established that prosecutors exercise their discretion in determining whether to pursue the death penalty in any aggravated murder case and for plea bargaining or other reasons they may not seek capital punishment. The exercise of this discretion however has inhibited our ability to conduct a meaningful proportionality review. No cases exemplify this problem more than those of Ridgway and Yates.
ś 167 We have continually grounded our proportionality review on the principles set forth in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), construing it as an additional safeguard to ensure that the death penalty is not imposed arbitrarily or capriciously. In Harris, we stated that "[t]he impetus for proportionality review derives from the Supreme Court decision in Furman . . ." 106 Wash.2d at 797, 725 P.2d 975. Additionally, in Lord we declared that our concern in conducting proportionality review is "with alleviating the types of major systemic problems identified in Furman: random arbitrariness and imposition of the death sentence based on race." Lord, 117 Wash.2d at 910, 822 P.2d 177. Thus, Furman presents the bedrock principles underlying our statutory review. To ensure that the sentence of death is not arbitrarily or capriciously imposed as required under Furman, we perform our proportionality review to determine whether "the death penalty has been imposed generally and not `wantonly and freakishly imposed.'" Harris, 106 Wash.2d at 798, 725 P.2d 975 (quoting Moore, 233 Ga. at 864, 213 S.E.2d 829).
ś 168 As the above discussion of our proportionality jurisprudence indicates, our appellate review as required by RCW 10.95.130(2)(b) has not only evolved but has continued to limit the focus of comparison to other death penalty cases. This approach ignores the statutory mandate to include all cases in which the defendant was convicted of first degree aggravated murder as "similar cases" for comparison. When we factor in all the cases required by statute and review the outcome of our previous cases, no rational basis exists to explain or conclude that the sentence of death in any given case is imposed generally in similar cases. Not only have we not generally included all cases where the defendant has been convicted of first degree aggravated murder in our review, the majority of the death penalty cases we have declared to be "similar" for comparison in proportionality review are no longer death penalty cases. Where, in previous cases our analysis has focused on "similar" cases where the death penalty was imposed, when those "similar" cases are no longer death penalty cases, our prior comparability analysis is undermined. This outcome renders it impossible to find that the death penalty is imposed generally in similar cases and leads to the conclusion that our historical approach to proportionality review is no longer viable.
ś 169 With Ridgway, Mak, Ng, Yates, Rice, and others in our pool of similar cases, our proportionality review reveals the staggering flaw in the system of administration of the death penalty in Washington. As stated earlier, the dual objectives of our proportionality review are to proscribe random arbitrariness in the imposition of the death penalty and to ensure that the sentence of death is not imposed because of a defendant's race. We accomplish this object through conducting a proportionality review to guarantee that "no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally and not `wantonly and freakishly.'" Harris, 106 Wash.2d at 798, 725 P.2d 975 (quoting Moore, 233 Ga. at 864, 213 S.E.2d 829). Comparing Ridgway, Mak, Ng, and Rice with the imposition of the death penalty in Dayva Cross's case, and including all other cases required by that statute as similar cases, the *115 penalty of death is not imposed generally in similar cases.
ś 170 These cases exemplify the arbitrariness with which the penalty of death is exacted. They are symptoms of a system where statutory comparability defies rational explanation. The death penalty is like lightening, randomly striking some defendants and not others. Where the death penalty is not imposed on Gary Ridgway, Ben Ng, and Kwan Fai Mak, who represent the worst mass murders in Washington's history, on what basis do we determine on whom it is imposed? No rational explanation exists to explain why some individuals escape the penalty of death and others do not.
SANDERS, OWENS and MADSEN, JJ., concur.
NOTES
[1] We recognize the record may be flawed. Juror "204" went through two separate voir dire sessions the same day. RP (Mar. 21, 2001) at 94-133; 152-167. It is not clear whether she was the same juror, brought back twice, or two different jurors. However, Cross has not shown abuse of discretion either way.
[2] E.g.,

Q. So you would never impose the death penalty?
A. I'm not saying that. I am opposed to it, but I'm not willing to say "never." . . .
Q. . . . Can you give us an example of when you wouldn't vote [for mercy], maybe something you read?
A. No, actually, I can't. I haven't encountered any situation or ever been in any situation where I would vote for the death penalty.
RP (Apr. 4, 2001) at 32-33.
[3] Any ineffective assistance of counsel claim for failure to request such an instruction is not before us, and we express no opinion on it. Nor do we express any opinion on whether this was a proper grounds for Cross to withdraw his guilty plea.
[4] The jury instruction stated:

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.
CP at 1986 (Jury Instruction 5). This is substantially similar to how we have defined premeditation in similar cases. Cf. State v. Pirtle, 127 Wash.2d 628, 644, 904 P.2d 245 (1995) (quoting RCW 9A.32.020(1)); State v. Gentry, 125 Wash.2d 570, 597-98, 888 P.2d 1105 (1995).
[5] We are not asked to determine whether Cross was entitled to such an instruction, and, of course, we express no opinion on it.
[6] We recognize that a law abiding jury might not have felt it could question an element of the underlying crime to which Cross pleaded guilt as a mitigating factor, notwithstanding the specific argument about it. However, we are not asked to decide whether he was entitled to such an instruction given the prosecution's assurances during the Alford proceedings or whether it was ineffective assistance of counsel to fail to request it. Cf. Clark v. Baines, 150 Wash.2d 905, 84 P.3d 245 (2004). As presented, we are unable to determine whether any other rights held by Cross were violated and, of course, we express no opinion on unasked questions. Cf. Penry II, 532 U.S. at 799, 121 S.Ct. 1910.
[7] Cross would have limited the mitigation evidence to sleep deprivation, alcohol, financial stress, socioeconomic pressure, and his confession. RP (Jan. 31, 2001) at 542-43.
[8] We assume for the purpose of argument that his motion for appointment of new counsel was timely. We recognize that might not have been so.
[9] Cross also argues that counsel's decision to admit mental health testimony was ultimately prejudicial to him, as it opened the door to evidence that did not show him in the best light. Nothing in this opinion should be read to foreclose reconsideration of this claimed prejudice in the context of an ineffective assistance of counsel claim. We express no opinion on the viability of that claim.
[10] Cross's proposed instruction was nearly identical:

The term "common scheme or plan" means that there was a connection or nexus between the murders and the victims thereof. The scheme or plan is [a] design, method of action, or system formed to accomplish a purpose.
CP at 1789.
[11] Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] The trial judge's written order states that defense counsel conceded that the interview with Detective Doyon was properly admissible. We assume this is a scrivener's error; counsel did vigorously contest admissibility. CP at 359-77. The record is somewhat ambiguous because a concession appears, but read in context it was probably limited to a concession that if Cross's statements were admissible, a transcript of a taped session was admissible. RP (May 1, 2000) at 28.
[13] While Cross was meeting with his attorney, he was overheard stating loudly: "I don't give a fuck. The motherfuckers are dead. I killed them. My life is over." CP at 1348. After noting that the statement was clearly audible outside of the conference room, the trial court ruled this admissible. CP at 1353. Given that Cross is not seeking to withdraw his plea, we do not reach whether this was an abuse of discretion.
[14] Additionally, Cross argues that the United States Supreme Court's current capital case jury selection jurisprudence is unconstitutional. We leave it in the able hands of the United States Supreme Court to determine whether their death qualification jurisprudence needs additional scrutiny. Based on existing precedents, we cannot so conclude ourselves.
[15] Again, we note that Cross was not precluded by his Alford plea from raising the argument. A holding that he can avoid the sentence because of his plea would frustrate the clear intent of the statutes in play. An ineffective assistance of counsel claim is the proper forum for considering whether he was entitled to, and prejudiced by the lack of, a premeditation instruction.
[16] Amicus American Civil Liberties Union has requested we appoint a special master to review these matters further. Without a greater showing of necessity, we decline to do so at this time.
[1] 101 Wash.2d 664, 683 P.2d 571 (1984) (death penalty imposed where defendant killed two people during a robbery with two aggravating factors present) (Rupe I).
[2] 101 Wash.2d 631, 683 P.2d 1079 (1984) (death penalty imposed where defendant killed one victim with two aggravating factors present).
[3] 70 Wash.2d 697, 425 P.2d 390 (1967) (death penalty imposed where defendant was convicted of murdering two children).
[4] 81 Wash.2d 124, 499 P.2d 1268 (1972) (death penalty imposed where defendant killed two people).
[5] In four cases the defendant received the death penalty, in two cases where the death sentence was sought the defendant received life without parole, in one case the prosecution did not seek the death penalty, and in one case a defendant was sentenced to life without parole after pleading guilty.
[6] Of the 31 cases the court surveyed, it rejected from the pool those cases in which the death penalty was not sought because the cases were not in the same "genus or family," and the court rejected cases exhibiting extremely brutal crimes. Benn, 120 Wash.2d at 692, 845 P.2d 289.
[7] 125 Wash.2d 570, 888 P.2d 1105 (1995). In Gentry, the defendant was sentenced to death for the murder of a 12 year old girl. One aggravating factor found was murder to conceal the identity of the defendant.
[8] The majority praises the prosecutors in the Ridgway case as "highly respected, honorable, and thoughtful" and calls the plea agreement "highly rational." In fact, this is little more than misplaced condescension. There is nothing rational about the prosecutors' decision here not to seek the most serious of penalties for one who has committed the most heinous of crimes.
[9] Dwayne Bartholomew; Gary Benn; James Brett; Michael M. Furman; Patrick Jeffries; Brian Lord; Sammie L. Luvene; Kwan Fai Mak; Henry L. Marshall, III; Blake Pirtle; David L. Rice; Michael K. Roberts; Mitchell Rupe.
[10] Benjamin Harris.
[11] Charles B. Finch.