IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51288-2-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| BRENT LUYSTER, | |
| Appellant. | |

GLASGOW, J. — Brent Luyster shot four people, three of them fatally.  Luyster and the victims, as well as some family members, had gathered at the home of Joseph Lamar to wish Luyster well because they believed he might be taken into custody soon.  Two men and two women were shot.  One of the women survived, and she identified Luyster as the shooter, both that night and at trial.

The jury returned verdicts finding Luyster guilty of three counts of aggravated first degree murder, one count of attempted first degree murder, first degree unlawful possession of a firearm, and second degree unlawful possession of a firearm.  Luyster appeals contending that the trial court violated his right to counsel by denying his motion to substitute counsel.  He also argues that

the trial court erred by failing to suppress evidence seized pursuant to a search warrant that Luyster asserts lacked probable cause. Luyster also appeals his sentence, contending that certain legal financial obligations must be stricken from his judgment and sentence in light of recent statutory amendments. Luyster raises various arguments for reversal of his convictions in a statement of additional grounds for review.

We affirm Luyster's convictions but remand solely for the trial court to strike the challenged legal financial obligations from his judgment and sentence.

FACTS

Brent Luyster lived with his mother, Susan Dvorak, and his brother, Michael Luyster, in Michael's house in Woodland, Washington.[1] Luyster moved into the house in July 2016 with his girlfriend, Andrea Sibley, and their toddler son. Luyster also has other children from prior relationships, including another son who was around 12 years old at the time. Sibley's father, Paul,[2] helped the couple move some of their possessions to a storage unit located just down the street from the Woodland house.

During this time, Luyster had a pending criminal charge in Cowlitz County for allegedly assaulting a former girlfriend. Luyster was out of jail on bail provided by his friends Zachary Thompson and Joseph Lamar. On July 15, 2016, Luyster's attorney told him that his Cowlitz County charge was going to be picked up by the federal government. Luyster was upset about this and told his friends and family that he believed the federal charge would result in his imminent arrest.

---

[1] For clarity, we refer to Michael Luyster by his first name.

[2] For clarity, we refer to Paul Sibley by his first name.

2

Early that afternoon, Sibley drove Luyster's two sons in her gold Ford Explorer to a house in Vancouver where Luyster and several of his friends and family were having a get together. Thompson and his girlfriend, Brienne Leigh, were among the guests. At some point during the get together, Lamar called Thompson and said that he wanted to see Luyster "before he goes away." Verbatim Report of Proceedings (VRP) at 532. Thompson then drove Leigh and Luyster to Lamar's home in Woodland. On the way to Lamar's home, Luyster asked for Thompson's gun and commented: "You guys know I would never hurt you, right[?]" VRP at 537. Lamar and his girlfriend, Janell Knight, were at the house when they arrived. The group drank and socialized.

Sibley left the Vancouver get together at around nine that evening and drove to Lamar's home with the children to pick up Luyster. Leigh and Knight took the 12 year old into the house to make him some food, while Sibley waited in her vehicle with the toddler. Luyster, Thompson, and Lamar remained outside the house and talked.

About 10 minutes later, Leigh heard two gunshots and went to tell the men to knock it off. As Leigh walked toward the door, Luyster came inside and shot her in the face. Sibley was sitting in the driver's seat of her vehicle with the toddler still in the back seat when she heard several gunshots and felt her driver's side window shatter all over her. Shortly thereafter, Luyster and his 12-year-old son got into the car, and Luyster told Sibley to "[g]et out of here. Go." VRP at 1642. Luyster's son appeared scared and was shaking. Sibley drove to Michael's house.

Leigh survived the gunshot to her face and woke up in a puddle of her blood, severely injured. Leigh saw that Knight had been shot and was dead on the couch. Leigh unsuccessfully looked for her phone to call 911 before driving to a nearby gas station.

Paula Langer, a registered nurse and former paramedic, was at the gas station when Leigh arrived. Langer provided Leigh with medical care while they waited for police and an ambulance to arrive. Leigh had difficulty communicating due to the nature of her injuries. But when police arrived, Leigh was able to convey that the shooting took place at Lamar's residence. Leigh was later transported to a hospital for emergency treatment. While hospitalized, police asked Leigh if she knew who had shot her; Leigh wrote down Luyster's name and that he was "in some big trouble with the feds." VRP at 1162-64.

Officers went to Lamar's house at around 11:00 p.m. that evening and saw Lamar's and Thompson's deceased bodies in the driveway, as well as Knight's deceased body on a couch in the house. Thompson had a gunshot wound on the left side of his neck, Lamar had a gunshot wound on the left side of his head, and Knight had gunshot wounds on her right cheek and on the right side of her neck.

Meanwhile, after Luyster, Sibley, and the children arrived at Michael's house, Dvorak called Michael and asked him to come pick up the 12 year old. At around 11:30 p.m. that evening, Luyster, Sibley, and the toddler left the house and drove in Sibley's Explorer to another relative's home in Ocean Park. While at the Ocean Park home, Luyster saw a news report on the television stating that police were searching for him as a suspect in the murders of Thompson, Lamar, and Knight.

Luyster and Sibley left with the toddler in Sibley's Explorer early that morning. Early that afternoon, they stopped at Abernathy Creek, walked down a slope to a creek, and laid down a blanket.

4

A maintenance worker in the area saw Sibley's Explorer and called 911. Several law enforcement officers responded to the 911 call and arrested Luyster without incident. After his arrest, police executed a warrant to search Sibley's storage unit located near Michael's home. Inside the storage unit, police found an empty case for a Kimber Raptor II pistol, part of an instruction manual for a Kimber firearm, and tools used to clean and maintain firearms.

On July 27, 2016, the State charged Luyster by amended information with three counts of aggravated first degree murder, attempted first degree murder, first degree unlawful possession of a firearm, and second degree unlawful possession of a firearm. Because the State was seeking the death penalty, the trial court appointed two attorneys to represent Luyster, Joel Yoseph and Edward Dunkerly.

At a March 6, 2017 hearing, the State informed the trial court that it was no longer seeking the death penalty. Defense counsel filed a motion for the continued appointment of co-counsel, which the trial court denied. When the trial court asked which defense attorney would be staying on to represent Luyster, Yoseph and Dunkerly both said that they would be seeking to withdraw. The trial court granted Yoseph's and Dunkerly's withdrawal motions and appointed Jeff Barrar as Luyster's defense counsel.

At a March 8 hearing, Luyster requested that the trial court reconsider its decision allowing Yoseph and Dunkerly to withdraw and appointing Barrar as counsel. Luyster said that Yoseph and Dunkerly had been working on his case for eight months and that he had confidence in their representation. Luyster also said that he believed Barrar had a conflict. The following day, Barrar requested to withdraw from representation based on his inability to communicate with Luyster.

The trial court granted Barrar's withdrawal motion and appointed Charles Buckley as Luyster's defense counsel.

A few months later, Buckley filed a motion for the appointment of co-counsel. The trial court granted the motion and appointed Steven Rucker as co-counsel.

On June 27, Luyster wrote a letter to the trial court that again asked it to reappoint Yoseph and Dunkerly as his defense counsel or, in the alternative, appoint new defense counsel. Luyster's letter said that he was having trouble effectively communicating with Buckley, that Buckley refused to request that Dunkerly be appointed as co-counsel because of a personal conflict between the attorneys, and that he believed Rucker could not adequately prepare for trial.

The trial court addressed Luyster's letter at a hearing. Buckley disagreed with Luyster's assertion that there was a complete breakdown in communication. Buckley said that he was communicating with Luyster on a weekly basis, they were able to work through certain disagreements, and the defense was on course to be fully prepared for the October trial date. The trial court denied Luyster's request to reappoint Yoseph and Dunkerly, noting that both attorneys had cases set for the fall and would not be available to represent him. The trial court also denied Luyster's request to appoint new counsel, noting that it did not have an adequate basis to do so.

On August 29, Luyster filed a pro se motion to discharge his defense counsel and reappoint Yoseph and Dunkerly. Luyster's pro se motion again alleged a communication breakdown and largely repeated the complaints contained in his June 27 letter. The motion further alleged that Buckley had appeared angry at him after bringing his concerns to the trial court in the June 27 letter. Luyster's motion also alleged that Rucker had admonished him for sending the June 27

letter, that Rucker violated the rules of professional conduct by telling him the details of another defendant's case, and that Rucker fired a defense investigator for no apparent reason.

At the hearing addressing Luyster's motion, Rucker said that he was vigorously preparing for trial and that he believed he could continue representing Luyster. Rucker told the trial court that the office of indigent defense made the decision to discharge one of the two investigators assigned to assist Luyster's defense because it was not a good use of resources. Buckley told the trial court that he did not believe there was a communication issue with Luyster but that he could not speak to Luyster's apparent lack of trust in his defense team. The trial court denied Luyster's motion but encouraged defense counsel to provide Luyster with information more rapidly.

Before trial, Luyster moved to suppress evidence seized from his storage unit. Luyster argued that the affidavit in support of the search warrant lacked probable cause because it did not contain sufficient information to establish the reliability of two people who had provided supporting information: Paul and the owner of the storage business, whose name was not revealed.

The search warrant affidavit stated that Sibley told police that she and Luyster moved into Michael's house a couple of weeks before the incident. The affidavit also stated that Paul told a police detective that he had helped Sibley and Luyster move into Michael's home, he helped the couple move some of their belongings into a storage unit across the road from Michael's home, and the storage unit was in Sibley's name. Paul provided a specific description of the location of Sibley's storage unit, and a police detective confirmed with the unnamed owner of the storage business that Sibley began renting storage unit number 36 approximately two weeks before. The affidavit concluded it was likely that Luyster and Sibley had accessed the storage unit when preparing to flee the area based on the storage unit's proximity to their residence and the amount

of items found in Sibley's vehicle when police recovered it. The trial court denied Luyster's suppression motion.

The matter proceeded to trial, at which witnesses testified consistent with the facts stated above. The jury returned verdicts finding Luyster guilty of three counts of first degree murder, one count of attempted first degree murder, first degree unlawful possession of a firearm, and second degree unlawful possession of a firearm.

At sentencing, the trial court found Luyster was indigent and did not have a likely ability to pay financial obligations. The trial court imposed legal financial obligations that included a $200 criminal filing fee, a $250 jury demand fee, and a $100 DNA collection fee. Luyster appeals from his convictions and resulting sentence.

## ANALYSIS

### I. RIGHT TO COUNSEL

Luyster first contends that the trial court violated his right to counsel by denying his motions to substitute his appointed defense attorneys. Because the trial court acted within its discretion when denying Luyster's motions, we disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution provide criminal defendants with the right to counsel. The constitutional right to counsel does not, however, provide indigent defendants with the right to choose a particular advocate. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004).

A defendant must show good cause to justify replacing their appointed defense counsel. *Id.* A conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the defendant and defense counsel constitutes good cause, for example. *Id.* In general,

"a defendant's loss of confidence or trust in his counsel is not sufficient reason to appoint new counsel." *Id.*

We review a trial court's refusal to appoint new counsel for an abuse of discretion. *State v. Lindsey*, 177 Wn. App. 233, 248, 311 P.3d 61 (2013). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.* at 249. When reviewing a trial court's refusal to appoint new counsel, we consider the timeliness of the motion, the adequacy of the trial court's inquiry, and the extent of the conflict. *Id.* Upon consideration of these factors, we conclude that the trial court did not abuse its discretion when denying Luyster's motions to substitute counsel.

In this case, the only issues in dispute involve the adequacy of the trial court's inquiry and the extent of the conflict between Luyster and his defense attorneys.

A.      Adequacy of the Inquiry

When a trial court is informed of a conflict between a defendant and counsel, it is obligated to thoroughly inquire about the factual basis of the defendant's dissatisfaction with counsel. *State v. Thompson*, 169 Wn. App. 436, 461, 290 P.3d 996 (2012). The trial court must make a "meaningful" inquiry that includes a "full airing" of the defendant's concerns. *State v. Cross*, 156 Wn.2d 580, 610, 132 P.3d 80 (2006), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018).

Here, the trial court reviewed Luyster's substitution motions and provided Luyster an opportunity to fully air his concerns at two separate hearings. The trial court also asked defense counsel to respond to Luyster's concerns. This was an adequate inquiry. Although Luyster appears to contend that the trial court should have asked questions regarding an alleged personal

conflict between a member of his defense team and a member of his previous defense team, he cites no case law supporting his contention. Nor does he establish how the alleged personal conflict would have any impact on his then-current defense counsel's ability to adequately represent Luyster at trial. Accordingly, an inquiry into the alleged personal conflict would not reveal good cause to substitute counsel and was irrelevant to the trial court's determination of whether substitution was warranted.

B.      Extent of the Conflict

To warrant substitution of counsel, a defendant must show that the alleged conflict with counsel would prevent the presentation of an adequate defense. *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). Luyster contends that a complete breakdown in communication warranted substitution of counsel. The record does not support this contention.

When asked about Luyster's assertion of a communication breakdown at the first hearing, defense counsel disagreed with Luyster's assessment, explaining that they were communicating with him on a weekly basis. At the second hearing, counsel again said that they did not perceive any issues with communication, stating that Luyster's issues appeared to be with his lack of trust. The trial court advised counsel to promptly provide Luyster with witness interview transcripts in an attempt to resolve Luyster's perception of a communication breakdown. Although Luyster perceived that there was a communication issue with his defense attorneys, the record shows that defense counsel were meeting regularly with him to prepare his defense. He has thus failed to show a complete breakdown in communications preventing the presentation of an adequate defense and warranting the substitution of counsel. *Stenson*, 132 Wn.2d at 734.

Subsequent proceedings further demonstrate that there was not a complete communication breakdown between Luyster and his defense counsel. When Luyster expressed frustration with being shackled during meetings with his attorneys, his defense counsel moved to allow him to be unshackled and signed liability waivers to achieve this aim. Luyster did not further allege any communication issues following the trial court's denial of his second substitution motion.

Having considered the relevant factors, we hold that the trial court acted within its discretion when it denied Luyster's motions to substitute counsel.

## II. SUPPRESSION MOTION

Next, Luyster contends that the trial court erred when it denied his motion to suppress evidence seized from the storage unit because, he argues, the affidavit in support of the search warrant lacked probable cause. Specifically, Luyster asserts that the affidavit failed to establish the reliability of Paul and the unnamed owner of the storage business. We disagree.

We review de novo a trial court's legal conclusion regarding whether an affidavit supported probable cause to issue a search warrant. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). But our de novo review gives great deference to the issuing judge's assessment of probable cause and resolves any doubts in favor of the search warrant's validity. *State v. Chenoweth*, 160 Wn.2d 454, 477, 158 P.3d 595 (2007).

A search warrant may be issued only if the supporting affidavit shows probable cause. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). "To establish probable cause, the affidavit must set forth sufficient facts to convince a reasonable person of the probability the defendant is engaged in criminal activity and that evidence of criminal activity can be found at the place to be searched." *State v. Lyons*, 174 Wn.2d 354, 359, 275 P.3d 314 (2012).

When determining whether probable cause existed to issue a search warrant where information was supplied by an informant, we apply the *Aguilar-Spinelli*[3] two-pronged test. *State v. Atchley*, 142 Wn. App. 147, 161, 173 P.3d 323 (2007). This test examines the (1) "'veracity'" or credibility of the informant and (2) the informant's "'basis of knowledge.'" *Id.* (quoting *State v. Jackson*, 102 Wn.2d 432, 435, 688 P.2d 136 (1984)). The veracity and basis of knowledge prongs are independent and both must be established in the affidavit in Washington. *Jackson*, 102 Wn.2d at 437. But if one prong is not established, independent police investigation that corroborates the tip can form the basis for probable cause. *State v. Vickers*, 148 Wn.2d 91, 112, 59 P.3d 58 (2002); *Jackson*, 102 Wn.2d at 438.

A.      Paul Sibley

The search warrant affidavit sufficiently established Paul's basis of knowledge. The basis of knowledge prong is satisfied where the person who provided the information to police had firsthand information about the facts asserted. *State v. Tarter*, 111 Wn. App. 336, 340, 44 P.3d 899 (2002); *see also Jackson*, 102 Wn.2d at 437. Here, Paul told a police detective that he personally helped Sibley and Luyster move some of their belongings to a storage unit that was rented in Sibley's name and that the storage unit was located close to Michael's residence where Sibley and Luyster were residing. Paul also described the specific location of the storage unit. Because Paul provided firsthand information about facts that he had personally witnessed, the basis of knowledge prong is satisfied.

---

[3] *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), *abrogated by Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), *but adhered to by Jackson*, 102 Wn.2d 432.

The search warrant affidavit established Paul's veracity. Where, as here, an informant is identified by name, the State's burden to establish the informant's veracity is relaxed. *Tarter*, 111 Wn. App. at 340. Here, Paul was a named citizen informant, and he provided firsthand details establishing that he had recently helped Sibley and Luyster move some of their belongings to a storage unit rented in Sibley's name. His daughter and the owner of the storage facility both corroborated the information he provided. Accordingly, the search warrant affidavit contained sufficient information to conclude that Paul was reliable.

B.      Owner of Storage Business

The search warrant affidavit established the unnamed storage business owner's veracity. Where a citizen informant is known to police but unnamed in the affidavit, "the affidavit must contain [sufficient] 'background facts to support a reasonable inference that the information is credible and without motive to falsify.'" *Atchley*, 142 Wn. App. at 162 (quoting *State v. Cole*, 128 Wn.2d 262, 287-88, 906 P.2d 925 (1995)).

Although the search warrant affidavit provided sparse background information regarding this unnamed citizen informant, it was sufficient to establish that the informant was credible and without a motive to falsify. The owner of the storage business merely corroborated Paul's information regarding the rental status and location of the storage unit at issue. Luyster fails to identify any motive to falsify information about the rental of the storage unit to police. Moreover, Paul corroborated the information provided.

The search warrant affidavit also established a basis of knowledge. The owner of the storage business would reasonably be expected to have firsthand knowledge of the names of customers renting storage units and the location of those units. And, even if the affidavit was insufficient to establish the business owner's basis of knowledge, this prong is established through the corroborating information that Paul supplied. *Jackson*, 102 Wn.2d at 438. Accordingly, Luyster cannot demonstrate that the search warrant affidavit failed to establish the reliability of the citizen informants. Because this is the only argument Luyster raises to challenge the search warrant affidavit's sufficiency, his challenge to the warrant fails.

### III. LEGAL FINANCIAL OBLIGATIONS

Next, Luyster challenges the imposition of the criminal filing fee, jury demand fee, and DNA collection fee in his judgment and sentence. The State concedes that each of these fees was improperly imposed in light of recent statutory amendments. We accept the State's concession and remand to strike the criminal filing fee, jury demand fee, and DNA collection fee.

In 2018, the legislature amended former RCW 36.18.020(2)(h) and former RCW 10.46.190 to prohibit trial courts from imposing the criminal filing fee and jury demand fee on defendants who are indigent as defined in RCW 10.101.010(3)(a) through (c). LAWS OF 2018, ch. 269, §§ 9, 17. The legislature also amended former RCW 43.43.7541 to authorize the imposition of a DNA collection fee only if the State has not "previously collected the offender's DNA as a result of a prior conviction." LAWS OF 2018, ch. 269, § 18. Our Supreme Court has held that the 2018 amendments to the legal financial obligation statutes apply to cases pending on direct review and not final when the amendments were enacted. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

The 2018 amendments apply here because this case was not final when the amendments took effect. *Ramirez*, 191 Wn.2d at 747. The State concedes that the trial court found Luyster to be indigent and that it has previously collected his DNA. Accordingly, we remand to the trial court to strike the criminal filing fee, jury demand fee, and DNA collection fee in light of the new law.

## IV. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

### A.     Speedy Trial

Luyster first argues in his statement of additional grounds that the trial court violated his constitutional speedy trial right when the State decided not to pursue the death penalty, and as a result, the trial court concluded that he was not entitled to two defense attorneys. He also challenges the trial court's order allowing his original defense attorneys to withdraw from his case.

Although a defendant raising issues in a statement of additional grounds is not required to reference the record or cite to legal authorities, they must "inform the court of the nature and occurrence of alleged errors," and this court "is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review." RAP 10.10(c). Here, Luyster does not present any argument regarding the propriety of the trial court's decisions to limit his appointed counsel to one attorney or to grant his original defense team's motions to withdraw, apart from alleging a violation of his constitutional speedy trial right.

### B.     Ineffective Assistance of Counsel

Next, Luyster raises several claims of ineffective assistance of counsel, all of which rely on matters outside the appellate record.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel.

*State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To demonstrate ineffective assistance of counsel, Luyster must show that his counsel's performance was deficient and that the deficient performance resulted in prejudice. *Id.* at 32-33. Courts engage in a strong presumption that counsel's representation was effective. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Trial counsel's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 667-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018). There is a "strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "To demonstrate deficient performance, a 'defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct.'" *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (quoting *McFarland*, 127 Wn.2d at 336).

We do not consider matters outside the trial record. *McFarland*, 127 Wn.2d at 335. If a defendant wishes to raise issues that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition. *Id.* Luyster argues that his defense counsel were ineffective for failing to object to forensic scientist Trevor Chowen's testimony that DNA detected on spent bullet cartridges found at the crime scene was the result of contamination. Evaluating whether counsel were deficient in this regard would require examination of facts outside the record.

Luyster's remaining claims of ineffective assistance of counsel rely on matters outside the record on appeal and, thus, we do not address them. If Luyster wishes to present these claims, he must do so in a personal restraint petition.[4] *McFarland*, 127 Wn.2d at 335.

C.      Evidentiary Rulings

Next, Luyster argues that the trial court abused its discretion by permitting a State's witness to display a firearm to the jury for illustrative purposes. We disagree.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Ashley*, 186 Wn.2d 32, 38-39, 375 P.3d 673 (2016). An abuse of discretion occurs when the trial court bases its decision on untenable grounds or reasons. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). Under ER 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

Luyster argues that the display of the firearm, which was not alleged to be the firearm used in the shootings, was unduly prejudicial and confusing to the jury. The State's witness briefly displayed a .45 semiautomatic pistol to the jury and explained certain features such as the barrel and safety features. During the display of the firearm, the State and the witness clarified to the jury that the firearm was not the same firearm used in the crimes at issue. The display of the firearm had some probative value because it allowed the jury to view features on a firearm that was similar to the firearm alleged to have been used in the shootings. And, the danger of unfair

---

[4] Specifically, we do not address Luyster's claims that his counsel were ineffective for failing to impeach Deputy Bryce Smith with inconsistencies in his police report, failing to impeach Sibley with inconsistencies between her testimony and statements she made during a police interview, failing to interview and call as a witness Detective Kevin Harper, and failing to present the full text of a document that the State had presented to the jury via overhead projector with "key portions" covered. Statement of Additional Grounds at 2.

prejudice or confusion was low in light of the clear explanation that the firearm displayed was not the same firearm used in the shootings. Accordingly, we hold that the trial court did not abuse its discretion by allowing the State's witness to display the firearm for illustrative purposes.

Luyster also argues that the trial court abused its discretion by admitting evidence of his pending second degree assault charge and that Thompson and Lamar had posted his bail for that charge. We disagree.

Before trial, the State moved in limine to admit evidence of Luyster's pending second degree assault charge and bail status, arguing that the evidence was admissible in part to establish his motive in shooting Thompson and Lamar. Defense counsel argued that the evidence was inadmissible under ER 404(b). The trial court ruled that the evidence was admissible to show motive and later provided a jury instruction limiting the jury's consideration of the evidence for this purpose.

Under ER 404(b), a defendant's prior misconduct is inadmissible to show the defendant's propensity to commit the charged crime. *State v. Fisher*, 165 Wn.2d 727, 744, 202 P.3d 937 (2009). But ER 404(b) does not prohibit evidence of the defendant's prior misconduct for other purposes, such as demonstrating motive, intent, a common scheme or plan, or lack of mistake or accident. *Fisher*, 165 Wn.2d at 744. ER 404(b) must be read in conjunction with ER 403, which "requires the trial court to exercise its discretion in excluding relevant evidence that would be unfairly prejudicial." *Fisher*, 165 Wn.2d at 745.

Before admitting evidence subject to ER 404(b), the trial court must "(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the

18

crime, and (4) weigh the probative value against the prejudicial effect of the evidence." *Fisher*, 165 Wn.2d at 745. Luyster argues that the evidence was not admitted for a proper purpose, was irrelevant to his crime, and was unduly prejudicial.

Here, ER 404(b) plainly states that a defendant's other acts may be admitted to demonstrate motive. Throughout the trial, the State elicited testimony that Luyster was upset that the federal government was taking up his second degree assault charge and feared that he would be taken into custody. The State argued at closing that Luyster's motivation in killing Thompson and Lamar may have stemmed from his perception that they could have revoked his bail or that they were informing on him. Luyster's motive in killing Thompson and Lamar is relevant to his charges of aggravated first degree murder because having a motive makes it more likely that he intended to cause their deaths. ER 401. Evidence establishing Luyster's motive was highly probative to his first degree murder charges and was not substantially outweighed by the danger of unfair prejudice in light of the trial court's limiting instruction. Accordingly, we hold that the trial court acted within its discretion when admitting the evidence.

D.      Change of Venue Motion

Next, Luyster argues that the trial court abused its discretion by refusing to grant his motion for change of venue. When determining whether a trial court abused its discretion by granting or denying a motion for a change in venue due to pretrial publicity, we examine a number of factors. These factors include, but are not limited to, the care exercised and the difficulty encountered in

the selection of the jury, the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them, and the challenges exercised by the defendant in selecting the jury, both peremptory and for cause. *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003). Here, the appellate record does not contain a transcript of the jury voir dire and, thus, we cannot examine these necessary factors on the record before us.

E.      Witness Misconduct

Finally, Luyster argues that the trial court erred by failing to question Sibley or investigate an allegation that she was viewing a Twitter news feed during trial that was reporting on the trial proceedings. We disagree.

Toward the end of trial, defense counsel expressed concerns that Sibley had been following the trial proceedings as reported on a Twitter news feed and requested that the trial court question her about whether the news feed affected her testimony. The trial court declined, noting that Sibley was not under any order to not read press coverage and, instead, was instructed only to not discuss her testimony with other witnesses. The trial court noted that defense counsel could recall Sibley as a witness to inquire whether viewing the news coverage affected her testimony, but defense counsel declined to do so. Because Sibley was not under any order prohibiting her from viewing press coverage, Luyster's claim that the trial court erred by failing to investigate the allegation that she had viewed coverage news feed fails.

No. 51288-2-II

We affirm Luyster's convictions but remand solely for the trial court to strike the challenged legal financial obligations from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Melnick, P.J.

Fearing, J.